In re George A. BAVELIS, Debtor.

George A. Bavelis, Plaintiff,

v.

Ted Doukas, et al., Defendants.

Bankruptcy No. 10–58583.
Adversary No. 10–2508.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

March 28, 2013.

Marion H. Little, Jr., Zeiger, Tigges & Little LLP, Columbus, OH, for Plaintiff.

Gary A. Goldstein, Baltimore, MD, Steven Newburgh, Steven S. Newburgh, P.A., West Palm Beach, FL, for Defendant.

John M. Stravato, Melville, NY, pro se.

## MEMORANDUM OPINION ON DEBTOR'S OBJECTION TO PROOFS OF CLAIM OF QUICK CAPITAL OF L.I. CORP.

JOHN E. HOFFMAN JR., Bankruptcy Judge.

### I. Introduction

The issue before the Court is whether Quick Capital of L.I. Corp. ("Quick Capital") or any entity affiliated with it holds a claim against the Chapter 11 bankruptcy estate of George A. Bavelis ("Mr. Bavelis" or "Debtor"). Ted Doukas, a/k/a Leftheris Doukas ("Mr. Doukas"), the president and sole shareholder of Quick Capital, asserts that Quick Capital has a secured claim against Mr. Bavelis based on a promissory note ("QC Note"), a loan agreement ("QC Loan Agreement") and a security agreement ("QC Security Agreement" and, together with the QC Note and the QC Loan Agreement, "QC Loan Documents") that Mr. Bavelis signed in June 2009. Quick Capital filed an original proof of claim for a lesser amount ("Original Proof of Claim"), but then filed an amended proof of claim, Claim No. 49–2 ("Amended Proof of Claim" and, together with the Original Proof of Claim, "Proofs of Claim"), in the amount of $14 million plus interest.

Although claims based on promissory notes and loan agreements are relatively commonplace in bankruptcy, there is nothing ordinary about the facts that gave rise to Quick Capital's purported claim. Mr. Doukas himself concedes that Quick Capital lent Mr. Bavelis no funds. Rather, he contends that the consideration provided for the QC Loan Documents was fourfold: (1) a $200,000 loan provided by means of a check that one of Mr. Doukas's other companies, Nemesis of L.I. Corp. ("Nemesis"), issued to Mr. Bavelis; (2) approximately $1.4 million of funds that Mr. Doukas transferred from certain bank accounts to purchase stock in Sterling BancGroup Inc.

("Sterling Holding"), allegedly on behalf of Mr. Bavelis; (3) Mr. Doukas's promise to pledge his assets to help resolve Mr. Bavelis's financial problems and to purchase nonperforming loans of Sterling Holding's banking subsidiary, Sterling Bank of Palm Beach County, Florida ("Sterling Bank"); and (4) Mr. Doukas's promise to provide consulting and management services to Mr. Bavelis, including attempting to resolve disputes with one of Mr. Bavelis's business partners, Mahammad A. Qureshi ("Mr. Qureshi"), in a manner that would be in the best interests of Mr. Bavelis. In the alternative, Quick Capital argues that, if Mr. Doukas in fact purchased the shares of stock in Sterling Holding on his own behalf and not on behalf of Mr. Bavelis, then Mr. Doukas personally has a claim against Mr. Bavelis under Florida state law regulating the sale of securities.

Mr. Bavelis takes the position that he owes nothing to Mr. Doukas or his companies. According to Mr. Bavelis, Mr. Doukas took advantage of, among other things, their shared Greek heritage; the close friendship that quickly developed between Mr. Doukas and Mr. Bavelis and his wife, Georgia Gia Bavelis ("Mrs. Bavelis"), after they first met Mr. Doukas in early 2009; Mr. Bavelis's need to complete his estate planning; and the desire on Mr. Bavelis's part to save the failing Sterling Bank and to extricate himself from the strained business relationship with Mr. Qureshi.

Based on the documentary evidence and the testimony of multiple witnesses, the Court concludes that the Proofs of Claim must be disallowed and that neither Mr. Doukas nor any of his companies has a claim against Mr. Bavelis or his bankruptcy estate. First, Mr. Bavelis repaid the funds that Nemesis advanced to him. Second, neither Mr. Doukas nor any of his companies provided the other consider-

ation allegedly supporting the QC Loan Documents. In this regard, the Court finds that Mr. Doukas purchased shares in Sterling Holding on his own behalf, not on behalf of Mr. Bavelis; that the assets that Mr. Doukas purportedly made available to restructure Mr. Bavelis's financial situation and/or to purchase nonperforming loans of Sterling Bank were never effectively used for that purpose; and that neither Mr. Doukas nor his companies ever provided consulting, management or estate planning services of any value, but instead perpetrated a scheme designed to deprive Mr. Bavelis of substantially all of his assets. In fact, Mr. Doukas made several representations that fraudulently induced Mr. Bavelis to sign the QC Loan Documents. Finally, the argument that Mr. Doukas personally has a claim against Mr. Bavelis based on Mr. Doukas's purchase of stock in Sterling Holding is without merit.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the Court's findings of fact are determined to be conclusions of law, they are adopted as such; likewise, to the extent any of the Court's conclusions of law are determined to be findings of fact, they are adopted as such.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(B).

## III. Findings of Fact

Based on the evidence adduced at trial,[1] including the documentary evidence and

---

1. The trial spanned four days, and its transcript exceeds 1,000 pages. The transcript

the testimony presented, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

## A. Events Occurring Before the Execution of the QC Loan Documents

### 1. Mr. Bavelis's Real Estate and Banking Businesses

This is the story of how Mr. Bavelis came to trust Mr. Doukas enough to issue one of his companies a multimillion dollar promissory note and how Mr. Doukas later took advantage of that trust. It is difficult to understand why Mr. Bavelis allowed himself to become so closely involved with Mr. Doukas without knowing something of Mr. Bavelis's background before the two men met. Mr. Bavelis was born in Greece in 1937 and emigrated to the United States in 1958. Tr. at 451–52. After obtaining a scholarship and earning a degree from the University of Arkansas in mechanical engineering, he began working as an engineer in Arkansas. Tr. at 452–53. He and Mrs. Bavelis (who also was born in Greece) married in 1964 and moved in 1969 to Columbus, Ohio, where Mr. Bavelis continued his work as an engineer. Tr. at 380; 453. In 1971, he began subleasing rental properties and thereafter purchased apartment buildings to lease. Tr. at 453–54; 493. In 1973, he became a real estate broker. Tr. at 454.

By sometime in 1975, Mr. Bavelis no longer worked as an engineer, but instead was engaged full time in the real estate business. Tr. at 454. He organized Pella Company, a Columbus real estate investment and management company, Debtor's Ex. 118 at 6, and over the years formed more than 30 real estate investment partnerships operating in Columbus ("Ohio

Partnerships"). Tr. at 454–55. Mr. Bavelis personally guaranteed the mortgage debt incurred by the Ohio Partnerships. Tr. at 465–66.

In 1996, Mr. Bavelis and other investors acquired Sterling Bank. Tr. at 226–27; 456; Debtor's Ex. 118, Confidential Memorandum Summary at 1. A federally-chartered savings bank, Sterling Bank converted into a commercial bank chartered by the State of Florida in 2004. Debtor's Ex. 118 at 1. Mr. Bavelis was a director of Sterling Bank and also was the chairman of the board, chief executive officer and president of its parent, Sterling Holding. Debtor's Ex. 118 at 6. At one point, Mr. Bavelis and members of the Bavelis family, directly and through trusts, owned somewhere between 52–55% of Sterling Holding. Tr. at 177; 458.

### 2. The Debtor's Relationship with Mr. Qureshi

In the early 2000s, a Sterling Bank lending officer suggested that Mr. Bavelis meet Mr. Qureshi, a customer of Sterling Bank, because Mr. Bavelis owned interests in six or seven gas stations, and Mr. Qureshi held interests in over 100 gas stations. Tr. at 458–59. The meeting went well, and the two men decided to go into business together. Tr. at 459. As Mr. Bavelis put it, "[Mr. Qureshi] came to my office and we met and we talked about what he was doing and what I was doing in the gas stations." Tr. at 459:11–13. "And we hit it [off] pretty well there, I thought he was a very nice guy and we kept talking and at some point we said, 'Why don't we just buy some gas stations together, invest some money together.' And we decided to get into the partnerships." Tr. at 459:13–18. From 2004 to 2007, Mr. Bavelis and Mr. Qureshi worked together to form limited

was filed in four parts: pages 1–378 at Doc. 196, pages 379–639 at Doc. 197, pages 640–

971 at Doc. 198 and pages 972–1,138 at Doc. 199.

liability companies for the purpose of investing in not only gas stations, but also office buildings and mixed-use real estate developments.

The result was an alphabet soup of companies. First, there was FLOMAQ, LLC ("FLOMAQ"), which was owned 50% by FLOHIO, LLC ("FLOHIO"), an Ohio limited liability company in which Mr. Bavelis had an indirect interest, and 50% by MAQ Management, Inc. ("MAQ Management"), named with the initials of its president, Mr. Qureshi. Tr. at 459–60. The successor in interest to FLOMAQ was FLOVEST, LLC ("FLOVEST"), formed in 2004 by equal members MAQ Management and FLOHIO. Tr. 461; Debtor's Ex. 14. The members of FLOHIO were Bavelis Family, LLC ("Bavelis Family"), Yessios Limited Partnership and Vakaleris Family Limited Partnership, with each owning one-third of FLOHIO. The Bavelises' three daughters each owned 30% of Bavelis Family, with Mr. Bavelis and Mrs. Bavelis each owning 5%. Mr. Bavelis was the manager of FLOHIO. Tr. at 460.

After FLOVEST came BMAQ, LLC ("BMAQ"), formed in 2005 by equal members Bavelis Family and Qureshi Family, LLC ("Qureshi Family"), of which Mr. Qureshi was a manager. Debtor's Ex. 15; Tr. at 461. Next there was GMAQ, LLC ("GMAQ"), formed in 2006 by equal members Mr. Bavelis and Mr. Qureshi. Debtor's Ex. 16; Tr. at 461. Finally, George Real Estate Holdings, LLC ("George Real Estate") was formed. Tr. at 461–62. The original members of George Real Estate were Mr. Bavelis and an individual affiliated with Mr. Qureshi. However, an unsigned, amended and restated operating agreement submitted by the parties suggests that GMAQ later became the sole member of George Real Estate. Debtor's

Ex. 17. The limited liability companies formed by Mr. Bavelis and Mr. Qureshi will be collectively referred to as the "Bavelis–Qureshi LLCs."

FLOVEST eventually became the owner of several properties, including a gas station in Indiana, a truck stop in Ohio and an office building and several parcels of land in Florida. It also began developing a shopping center in Lake Mary, Florida that the parties referred to as the "Lake Mary Project." Tr. at 463. BMAQ acquired four gas stations as well as land in Florida and Georgia. Tr. at 462–63. In order to finance these projects, Mr. Bavelis and Mr. Qureshi caused FLOVEST and BMAQ to obtain loans from various lenders, Tr. at 463–64, including Fifth Third Bank ("Fifth Third"), First Southern Bank ("First Southern"), Colonial Bank, N.A. ("Colonial Bank") and Heartland Bank. The aggregate principal amount of the debt owed by FLOVEST and BMAQ to those banks was approximately $21 million. Of this amount, the vast majority (more than $18 million) was the debt of FLOVEST.

Mr. Bavelis personally guaranteed (or otherwise had personal liability on) all of this debt, Debtor's Exs. 19–26,[2] Tr. at 464–65, and Mr. Qureshi personally guaranteed at least some of it. Debtor's Exs. 23, 26. GMAQ had no bank debt, so Mr. Bavelis had no guarantee obligations with respect to that company. Tr. at 462. Likewise, there is no evidence that Mr. Bavelis guaranteed any debt of George Real Estate or that it had any debt.

The relationship between Mr. Bavelis and Mr. Qureshi was good for several years, but it began to deteriorate after Mr. Bavelis came to believe that Mr. Qureshi and MAQ Management were not providing

---

**2.** Debtor's Ex. 26 is a promissory note, not a guarantee, issued by Mr. Bavelis, Mr. Qureshi and FLOMAQ. The other referenced exhibits are copies of guarantees.

a sufficient share of the funds to service the debt of BMAQ and FLOVEST. Tr. at 467–68.[3] In order to service that debt, Mr. Bavelis borrowed money from FLOHIO and Pella Company. Tr. at 467–68; 472.

### 3. The Debtor's Relationship with Mr. Doukas

Mr. Bavelis was about to meet a different sort of businessman in Mr. Doukas. According to a biography he provided to Mr. Bavelis, Mr. Doukas was born in Greece and was educated in medicine at the University of Pisa in Italy and in business at the New York Institute of Technology. He began, the bio stated, his "investment career" in Long Island, New York, leading to a self-proclaimed "very successful career as a financier and real estate developer." Debtor's Ex. 46 at GB 000790. Mr. Doukas's business, by his own account, was "creat[ing] a leverage that you can negotiate so it will make money...." Tr. at 843:22–23. "I buy things ... that are dead...." Tr. at 843:23–24. "[T]hese days they call me undertaker because I buy things that are finished, they don't have any life and I'm trying to bring life out of it." Tr. at 843:24–25–844:1–2. Consistent with that approach, in October 2008, a company that Mr. Doukas owned—Blair International, Inc., a Nevada corporation ("Blair")—took quitclaim deeds to over 50 parcels of real property located in Fort Lauderdale, Florida. The grantor was a company ("Glenn Wright Co.") operated by Glenn Wright ("Mr. Wright"), a Fort Lauderdale home builder. Debtor's Ex. 46 at GB 000791; Tr. at 841; 912. Sterling Bank held mortgages on seven of the parcels securing loans it had made to Glenn Wright Co. for the construction of single-family homes.

Tr. at 913. At the time Glenn Wright Co. delivered the deeds to Blair, the loans from Sterling Bank were in default, Tr. at 643–44; 842, and Mr. Doukas was aware that the properties were subject to Sterling Bank's liens. Tr. at 297. In addition, the homes on the lots were uncompleted, with buyers ready, willing and able to purchase at least some of the homes upon completion. Tr. at 231–32; 247–48.

Mr. Wright informed Sterling Bank of the transfers to Mr. Doukas, who was then contacted by representatives of the bank. Tr. at 644–45. It would soon become apparent to those representatives that Mr. Doukas's goal was to receive payment in exchange for deeds in lieu of foreclosure. Tr. at 843. Mr. Doukas's description of the negotiations with those representatives—including David Albright ("Mr. Albright"), the president and chief executive officer of Sterling Bank—is revealing with respect to Mr. Doukas's thought process at the time:

> [T]hey were trying to negotiate with me. So at that point they had, the bank had two loans that they had to close by December 31 st, the same year, 2008. And what happened, these loans were very substantial, there was about 1.5 million dollars every loan, about that number. And what will happen is the bank will have a big problem because if they were not closing these loans was the end of the fourth quarter and then they will have to put the capital into the, into the bank because for reserves, because that loan was in default. So there were two buyers previously and this was a very unique thing, that had already signed a contract with a higher price. Now if they would lose these two buy-

---

**3.** Mr. Qureshi disagrees with Mr. Bavelis's assessment of his efforts to service the debt of the Bavelis–Qureshi LLCs. Debtor's Ex. 173 at 66–69; Quick Capital Ex. N at BAV 00040.

Nothing in this opinion should be construed as a finding regarding the relative merits of Mr. Bavelis's and Mr. Qureshi's beliefs in this regard.

ers, the new buyer would never even touch these two houses, they will be empty forever. And that was the big thing that was going down with the bank, they were trying to negotiate with me.

So they came to the office and I told them, listen, I will work with you but, you know, I have to get paid and I have, you know, what is for me because I didn't do this for nothing, so what is for me, what am I going to get? So we argue and we're going back and forth and we didn't have very good, a very good meeting. As a matter of fact I told them I would not make any deal. I'm done.

So they were very desperate and then they called me again and I hung up on them. I said, "Listen, I'm not going to do any deal with you guys if you're not reasonable and what you're going to give me as a bank and to go and sign the deeds back to you, whatever, cooperate with you so you don't lose the two buyers.

Tr. at 842:12–843:19.

Mr. Bavelis was not involved in the negotiations on behalf of Sterling Bank at that point. Because the negotiations were not going well, and because Mr. Bavelis was, like Mr. Doukas, of Greek descent, Mr. Albright contacted Mr. Bavelis in November 2008 to inquire if he knew Mr. Doukas. Tr. at 642. Mr. Bavelis did not know him, Tr. at 473, and was reluctant to become involved due to other pressing matters, including the terminal illness of his brother. Tr. at 474. Mr. Albright persisted, Tr. at 645, and Mr. Bavelis ultimately agreed to help. As Mr. Bavelis describes it:

And in fact [Mr. Albright] told me that he and . . . another employee . . . apparently went to his office and then he, Ted Doukas was very belligerent

with them. He, I guess he cussed them out and all this kind of things. And I said, "David, please I have so many other things" and that was a time when my brother was very sick and unfortunately passed away the 23 of December of 2008. And I just said, "Please, work things out. I just don't have the time." But then he proceeded to call me again and I said, "Okay, I'll call him." So I called Ted Doukas on the phone and I talked to him and I told him that "I understand there were some problems here, what, what can we do to resolve, Ted?" And he said, "Are you a Greek?" I said, "Yes, I'm a Greek." "I'm a Greek, too." I said, "Well, great." So we spoke for a while and we hit it [off] very well. I was really very happy that we got somebody to finally communicate and hopefully the bank resolve some problems.

Tr. at 474:9–475:2.

Thomas A. Vogel ("Mr. Vogel"), a director of Sterling Bank and Sterling Holding, Tr. at 230, held a dim view of Mr. Doukas's involvement with the properties. According to Mr. Vogel, Mr. Doukas made the process more difficult for Sterling Bank:

[W]e didn't have control, Glenn Wright Construction is out of town, Glenn Wright takes off and we're dealing with Mr. Doukas. So we struggled our way, the plans all of a sudden [were] missing, permits we couldn't find. We brought in a contractor as the bank to try and just finish them up. We started dealing with the owners or the prospective owners of the homes to get them enough done to where we could get them closed. And it was a very difficult process.

. . . .

We had to discount the prices. And we got out of them but it was a loss.

Tr. at 233:9–234:2.

Mr. Bavelis testified that he was advised at some point that "because of the delays while [Mr. Doukas] was the owner of Blair International[,] the bank had to concede to the buyers." Tr. at 650:22–24. "And instead of the buyer having to do certain improvements, the bank accepted the responsibility to do it and pay for it so that they can close the loans before the end of the year." Tr. at 650:25–651:3. At the time, however, Mr. Bavelis did not share Mr. Vogel's views of Mr. Doukas's involvement. "It was very important for the bank to close the two loans," Mr. Bavelis testified. "[I]t was the 30th or 31st of December and [Mr. Doukas] was available on the phone. I think he was in Naples at the time to assist the bank in signing whatever paperwork was necessary to close those two loans." Tr. at 649:25–650:4. From Mr. Bavelis's perspective, Mr. Doukas, "[o]nce he found out that I was a Greek and we talked a little bit about background then he was cooperative with David Albright to close the loan." Tr. at 650:8–11. As distasteful as Mr. Doukas's involvement was to Mr. Albright and Mr. Vogel, Mr. Doukas's decision to cooperate after Mr. Bavelis became involved was a springboard for a relationship of trust and confidence that developed between Mr. Bavelis and Mr. Doukas.

A close relationship rapidly formed between Mr. Bavelis and Mr. Doukas. After speaking on the telephone just the month before, they met in person for the first time in early January 2009 during a dinner at which they "talked about [their] heritage, about [their] life in Greece and so on . . . ." Tr. at 478:15–17. By February 2009, Mr. Bavelis considered Mr. Doukas to be a very good friend. Tr. at 478–80. And Mr. Doukas began referring to Mr. Bavelis—whose own brother had died in December 2008—as his "brother." Tr. at 391–92; 492–93. As Mr. Bavelis testified, "I just lost my brother and I find another brother." Tr. at 492:25–26. In the supposed fraternity that formed between the two men, Mr. Bavelis would have been the elder of the two. Mr. Doukas's bio stated that he had restructured companies "throughout the past 25 years," Debtor's Ex. 46 at GB 000791, a time line that likely would place him in his mid–50s, and he appears to be a decade or two younger than Mr. Bavelis, who is in his mid–70s.

Mr. Bavelis had known Mr. Vogel long before he knew Mr. Doukas. In fact, Mr. Vogel had known Mr. Bavelis since the mid–1990s, considered him a friend, Tr. at 227, 230, had "never seen George ever do anything inappropriate," Tr. at 230:5–6, and believed him to be "extremely truthful." Tr. at 230:19. When Mr. Vogel raised his concerns about Mr. Doukas, stating to the effect that Mr. Doukas was "going to be a problem," Tr. at 239:2–3, "Mr. Bavelis was very much kind of adamant that he was, he used the word brother and a friend [with respect to Mr. Doukas] and it was that he was going to help us and it was going to be good." Tr. at 239:14–17. . Mr. Bavelis's views in this regard were confirmed by Richard Moyle Fritz, Jr., the chief financial officer of Sterling Bank and Sterling Holding, Tr. at 143, who testified that Mr. Bavelis placed "great value [on Mr. Doukas's] being Greek and, you know, he was very trusting." Tr. at 171:21–22. "He said trust him like a brother. And put great value and emphasis on the fact of they both being [of] Greek . . . heritage." Tr. at 171:22–25.

Whether or not Mr. Doukas initially shared Mr. Bavelis's feelings, he acted as though he did and even referenced their friendship when writing to Mr. Bavelis in

business-related emails. For example, when corresponding with Mr. Bavelis about five other lots that Glenn Wright Co. had quitclaimed to Blair and on which Sterling Bank held mortgages securing notes that were in default, Tr. at 477; 651–52, Mr. Doukas sent Mr. Bavelis an email on February 12, 2009 stating as follows: "i didn't forgot about the houses that we have to finish. I have already 3 or 4 bids and we will take the best one that we can save you money. *i want you to minimize your loses and i am doing this because we are friends for life.*" Debtor's Ex. 44 at GB 000834 (emphasis added).[4]

An apparent friendship also developed between Mr. Doukas and Mrs. Bavelis. The first time she met Mr. Doukas was sometime in late February or early March 2009, when the Bavelises had dinner with Mr. Doukas at the Greek Islands restaurant in Fort Lauderdale, Florida. Tr. at 384–88; 482. As Mrs. Bavelis testified, Mr. Doukas divulged personal information about his ex-wife and children during the dinner conversation:

> [W]e connected very, very fast because [Mr. Doukas] just told us everything about himself and about his family, about his divorce.
>
> . . . .
>
> He told me how horrible his wife was. How horrible his daughters were. They took everything from him. He told me the whole night he was going on and on about his personal life, about his home, about his—how he lived with his wife all these years and how bad she was. And

his daughters were calling him names and I thought ... how can a child do this to the father. And I, I just felt terrible for him.

Tr. at 385:6–27. The Bavelises, who maintained homes in Columbus, Ohio and Boca Raton, Florida, would see Mr. Doukas frequently during their time in Florida, with Mr. Doukas often coming to their home for dinner. Tr. at 388. During the summer of 2009, Mr. Doukas, who had a residence on the Gulf Coast of Florida, Tr. at 848–49, would sometimes stay in another condominium the Bavelises owned in the same building in which they lived in Boca Raton (which is on Florida's Atlantic coast), so that Mr. Doukas would not have to travel so frequently back and forth between the east and west coasts of Florida. Tr. at 410; 848–49.

During these visits, in addition to sharing intimate details about his ex-wife and children, Mr. Doukas endeared himself to the Bavelises in other ways. He told them that he had helped his family in Greece financially, as Mr. Bavelis had helped his family. Tr. at 389. He led them to believe that he shared the Bavelises' religious beliefs, that he was a member of a Greek Orthodox church and participated regularly in its services. Tr. at 389–90.[5] He presented them with a religious icon that he said was from Greece. Tr. at 390. Mr. Doukas told Mrs. Bavelis that the purpose of this icon was to "protect your house and to bless you." Tr. at 390:1–2. "And that made me feel even more comfortable about him," Mrs. Bavelis said. Tr. at 390:2–3. "I kept telling George,

---

4. In an effort to enhance this opinion's readability, the Court generally will set forth all passages from written correspondence as they appear in the original without using "sic" or brackets to indicate the need for corrections.

5. According to text messages he sent to Mr. Bavelis in December 2009, Mr. Doukas took a similar approach during negotiations that he

later undertook with Mr. Qureshi. Among other things, Mr. Doukas advised Mr. Bavelis that he was praying with Mr. Qureshi, Tr. at 621, and learning the Koran, Tr. at 779, stating that Mr. Qureshi "he thinks him and me are together." Debtor's Ex. 67 at GB 004054, GB 004056.

look at this man, I mean he is such a good man, how can he, how can his wife and his family do all of these things to him." Tr. at 390:4–6.

By the spring of 2009, Mr. Bavelis was "working around the clock," Tr. at 479:16–17, and was taking prescription medication to alleviate anxiety. Tr. at 383. Mr. Bavelis and Mr. Doukas would discuss the causes of Mr. Bavelis's stress, including, among other things, the "problems with Qureshi." Tr. at 388:13–14. Mr. Doukas promised Mr. Bavelis that he would negotiate with Mr. Qureshi in an attempt to resolve those problems in a manner favorable to Mr. Bavelis. Tr. at 393, 482–83. Mr. Doukas also made similar representations to Mrs. Bavelis. In so doing, Mr. Doukas referenced the fraternity he purportedly felt with Mr. Bavelis when he told Mrs. Bavelis that "the only reason he's doing this [is] to help George . . . because he's his brother . . . ." Tr. at 396:7–8. Mr. Doukas also advised Mrs. Bavelis that he was not seeking remuneration in exchange for his services. "He told me a couple of times, 'Did I ever ask for anything? Did I ever ask for money? I don't want anything. I just want to help George because I cannot see him stressing so much. He's going to get sick.'" Tr. at 396:16–20. "[H]e told me that he was retired and the only reason he's doing this to help George is because he's his brother and he wants to help him to take care of Qureshi's business," Tr. at 396:6–9, and that Mr. Doukas "doesn't have to work, he doesn't need the money. He has money, he doesn't have to work." Tr. at 396:9–11. These conversations typically would occur while Mr. Bavelis was working at his computer, with Mrs. Bavelis and Mr. Doukas sitting nearby. Tr. at 393.

The conversations would sometimes take on a more ominous tone. Mr. Doukas even advised Mrs. Bavelis "at one point that [Mr. Qureshi is] around bad people and he can have someone kill George." Tr. at 397:5–6. Of course, she "was really shaken by that." Tr. at 397:6. "But then he just calm me down somehow." Tr. at 397:6–7. "He told us that he [Mr. Doukas] was working with the FBI . . . ." Tr. at 397:10–11. "And he told us, you know, all these things. 'I'm going to get Qureshi, he cannot get away. He's doing all these bad things and he's trying to ruin you. And I'm going to take care of all these problems.'" Tr. at 397:16–20. Not only did Mr. Doukas make these statements, Mrs. Bavelis believed them. Tr. at 397–98. There is no evidence, however, that any of the things Mr. Doukas told the Bavelises about Mr. Qureshi were even remotely true.

At that point, the friendship between Mr. Bavelis and Mr. Doukas was based on several factors, including their common Greek heritage; their mutual entrustment of details about their personal lives and businesses; values they ostensibly held in common; and Mr. Bavelis's belief that Mr. Doukas had only his best interests at heart. In March 2009, Mr. Doukas informed Mr. Bavelis that, in order to advance those interests, he would need a 10% stake in GMAQ so as to be in a better position to negotiate with Mr. Qureshi. Tr. at 487. Mr. Bavelis, who by then had introduced Mr. Doukas to Mr. Qureshi, Debtor's Ex. 173 at 5:23, agreed. On March 27, 2009, Mr. Bavelis (as a member of GMAQ), Mr. Doukas (on behalf of Blair) and Mr. Qureshi (as a member of GMAQ) signed an agreement entitled "GMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("March Agreement"). Debtor's Ex. 130. By that agreement, Mr. Bavelis transferred to Blair 10% of his membership interest in GMAQ, with Mr. Qureshi consenting to the transfer. Mr. Doukas promised Mr. Bavelis that, as soon

as a resolution was reached with Mr. Qureshi, he would return the March Agreement and reconvey the 10% interest back to Mr. Bavelis. Tr. at 490. Mrs. Bavelis confirmed that Mr. Doukas so advised her husband. Tr. at 430:11–27 ("We didn't question Ted, we trusted Ted Doukas. He told us, he told George he was going to bring the 10% back.... It was given to him so he can negotiate with Qureshi and as soon as he did that he would give this 10% back. I didn't think anything of it.").

In addition to talking about the problems with the Bavelis–Qureshi LLCs, Mr. Bavelis and Mr. Doukas discussed the banking business. Mr. Bavelis asked Mr. Doukas if he would be interested in purchasing shares in Sterling Holding, and Mr. Doukas said that he would purchase shares. Tr. at 485. Consistent with that representation, in March 2009, Mr. Doukas paid over $200,000 to purchase 1,200 shares of stock in Sterling Holding. Tr. at 204; 485; 603–04; 848. This appeared to have further deepened Mr. Bavelis's trust in Mr. Doukas. On March 27, 2009, Mr. Bavelis sent a letter to Mr. Doukas enclosing a stock certificate for those shares. Debtor's Ex. 119 at BAV 00256.

The two men also discussed the idea of Mr. Doukas depositing funds in Sterling Bank. After Mr. Doukas advised Mr. Bavelis "that he had a lot of money in New York[,]" Tr. at 492:5, Mr. Bavelis suggested that Mr. Doukas begin depositing money in Sterling Bank. And I said, "Ted, why don't you move it? You move down here to Florida, why don't you move your money here?" He said, "Yeah, George, I will do that." Tr. at 492:6–8. On April 24, 2009, Mr. Doukas sent Mr. Bavelis an email attaching a letter from New York Commercial Bank ("NYCB") stating that Mr. Doukas had been banking with NYCB since February 15, 2000, identifying four accounts that Mr. Doukas maintained at

NYCB and stating that he "maintains the highest level of trust with New York Commercial Bank." Debtor's Ex. 45 at GB 000817. That same day, Mr. Bavelis forwarded the NYCB letter to Regina Waterhouse, the chief retail banking officer of Sterling Bank, asking her to "help in opening the [accounts] that Ted needs so that he can transfer his money into Sterling Bank[,]" and to "keep in mind that Ted is a very close friend of mine and a substantial shareholder." Debtor's Ex. 45 at GB 000814. Ms. Waterhouse began working to help Mr. Doukas open the accounts. Debtor's Ex. 50 at GB 000709.

On April 24, 2009, Mr. Doukas emailed Mr. Bavelis a biography and a list of selected accomplishments. That biography painted a picture consistent with the independently wealthy individual Mr. Doukas previously had portrayed to the Bavelises. Among other things, the list of selected accomplishments stated that Mr. Doukas was the "[o]wner of approximately $30,000,000 of private stock...." Debtor's Ex. 46 at GB 000791.

Meanwhile, with respect to the Bavelis–Qureshi LLCs, FLOVEST was the most pressing problem. Among the properties it owned, only two of them—the office building and the gas station—were producing income, meaning that it was becoming increasingly difficult for FLOVEST to make its mortgage payments. With an outstanding balance in excess of $10 million, the loan for the Lake Mary Project matured, and in May 2009 Colonial Bank notified FLOVEST that it would not renew the loan. Tr. at 468–71. Colonial Bank eventually initiated foreclosure proceedings and sought the appointment of a receiver for FLOVEST. Tr. at 472. Sometime in the second quarter of 2009, before the execution of the QC Note, conversations occurred in which Mr. Doukas promised Mr. Bavelis that he would ac-

quire certain debt that Mr. Bavelis had guaranteed—including the $3.7 million debt held by First Southern and the more than $10 million debt held by Colonial Bank with respect to the Lake Mary Project. Mr. Doukas advised Mr. Bavelis that this would help alleviate Mr. Bavelis's stress arising from his dealings with the banks. Tr. at 500–02.

At that time, Sterling Bank and Sterling Holding, like Mr. Bavelis, were having financial difficulty. Tr. at 143–49; 174–75. At least part of Sterling Bank's problems stemmed from nonperforming loans resulting from the distressed economy and depressed real estate values in Florida. Tr. at 144–45; 187. Sometime before October 2008, state and federal regulators had recommended that Sterling Bank improve the quality of its assets. Tr. at 172–75. In June 2009, Sterling Holding would be required by the regulators to raise additional capital, Tr. at 145–46, and by August 2009 the board of directors of Sterling Holding would approve a plan to raise $12.6 million of capital. Tr. at 149–50. Aware of Sterling Bank's financial problems, in May 2009, Mr. Doukas promised Mr. Bavelis that he would assist Sterling Bank by purchasing certain of its nonperforming loans. Tr. at 504–05; 510; 890–92. In the biography he had presented Mr. Bavelis, Mr. Doukas had noted his "ability to negotiate and restructure large debts." Debtor's Ex. 46 at GB 000790.

At least as early as May 2009, Mr. Bavelis and Mr. Doukas had conversations in which they broached the idea of Mr. Doukas becoming a substantial investor in Sterling Holding. Tr. at 507. As Mr. Bavelis put it: "[Mr. Doukas] got very interested in the banking business and . . . at some point we talked about the two of us owning the majority of the bank. And he was willing to invest a lot of money in the bank. He said he had a lot of money and he was willing to invest it." Tr. at 507:21–26. Mr. Bavelis cautioned Mr. Doukas in this regard:

I talked to him all along where we stood with the bank and that we had to raise capital and we had to raise 12 million dollars in capital by June 2010. And we talked about this very specifically and I said, "We either invest the 12 million dollars or we don't invest any money at all because we're going to lose it." And he said, "George, don't worry about it. I have enough money of my own and I have enough friends and I have enough contacts, don't worry about it. I'll take care of that, I'll find the money.

Tr. at 508:18–509:1. Mrs. Bavelis also expressed concern about Mr. Doukas purchasing the stock, telling him that she did not "want anything to happen to [his] money." Tr. at 408:3. In response, Mr. Doukas told her that he was going to purchase more stock on his own behalf and allayed her concerns by saying: "Don't worry, don't worry, everything is okay. I take my chances and I always win." Tr. at 408:4–5. Sometime in May 2009, Mr. Doukas advised Mr. Bavelis that he might make additional stock purchases in Sterling Holding of $3 million. Tr. at 680–81.

In a move that enhanced Mr. Bavelis's trust and confidence in his friend, Mr. Doukas caused $2 million to be deposited into accounts maintained at Sterling Bank. Tr. at 131; 676; 944; 951–55. In particular, on May 22, 2009, Nemesis deposited two checks—one in the amount of $270,000 and another in the amount of $1,730,000, for a total amount of $2 million—into accounts maintained at Sterling Bank. Debtor's Ex. 98 at IB/DOU 00072; IB/DOU 00074. Those amounts came from Mr. Doukas's divorce proceeding. Tr. at 944. With those amounts already deposited, Mr. Doukas promised Mr. Bavelis that he would deposit an additional $80,000 to

$120,000 every month in Sterling Bank from income that he or his companies received. Tr. at 1058–59. Based on these representations regarding the purchase of stock and the deposits in Sterling Bank, on May 23, 2009, Mr. Bavelis sent Mr. Albright an email in which he stated:

I have Ted's tax returns in the # 1 fire proof drawer

When you talk to Ted please talk to him as a friend of the bank, a very good friend of mine and a prospective investor in the bank of three million dollars. Without Ted's investment it will be very difficult for us to raise the required capital. As you are well aware he has deposited in the bank about two million dollars and he will be depositing his receivable rent checks of 80–120 thousand dollars a month in our bank.

Debtor's Ex. 56 at GB 000656. As this email shows, Mr. Bavelis had obtained Mr. Doukas's tax returns for Mr. Albright to review. Before leaving them in the drawer for Mr. Albright, Mr. Bavelis did not review the tax returns. Tr. at 679–80.

In May 2009, Sterling Bank was still attempting to sell five of the lots that Glenn Wright Co. had quitclaimed to Blair in October 2008. At the time Blair received the quitclaim deeds, Mr. Doukas knew the five lots were subject to Sterling Bank's liens. Tr. at 297. Mr. Doukas ultimately placed deeds to the five lots in escrow while Sterling Bank worked to finish the homes by using another contractor. Tr. at 251–52. According to Mr. Vogel, "the homes took twice as long as it would have taken ... if [they were not] quit claimed out." Tr. 252:24–25.[6] Mr. Doukas's approach to the deal, though, did not harm the relationship between Mr. Bavelis and Mr. Doukas, who previously had told Mr. Bavelis that he was handling the

transaction in the manner he was "because we are friends for life." Debtor's Ex. 44 at GB 000834.

Mr. Bavelis not only thought of Mr. Doukas as a close friend and brother, he also considered him a trusted business advisor. With respect to one real estate project in Florida, in May 2009, Mr. Bavelis sent an email to another man stating that Mr. Doukas was his "special friend and partner" and requested that the man speak to Mr. Doukas to hear Mr. Doukas's "strategy he plans for us to succeed." Debtor's Ex. 51 at GB 000707. Also in May 2009, Mr. Bavelis advised Mr. Albright that "the time has come that you need to utilize Ted's help to try to clear up as [many] of these [nonperforming] loans ASAP." Debtor's Ex. 52 at GB 000704. With respect to other transactions, Mr. Doukas was advising Mr. Bavelis that "I know I can handle it this is my cup of tea" and "these are the kind of deals I work all day." Debtor's Ex. 55 at GB 000675. An email that Mr. Bavelis sent to an attorney involved with Sterling Bank litigation in early July 2009 is indicative of how Mr. Bavelis viewed Mr. Doukas's role in June 2009. In that email, Mr. Bavelis referred to Mr. Doukas as "a friend and advisor of mine" and requested that the attorney speak to Mr. Doukas so that "he can understand the case." Debtor's Ex. 58 at GB 000039.

Mr. Doukas had led Mr. Bavelis to believe that he was negotiating with Mr. Qureshi to resolve the disputes over the Bavelis–Qureshi LLCs in a manner favorable to Mr. Bavelis, but that his negotiations had failed to reach such a resolution because Mr. Qureshi "was not taking [Mr. Doukas] seriously," Tr. at 707:6–7, and that he therefore needed more authority to negotiate with Mr. Qureshi. Tr. at 568;

**6.** Ultimately, Sterling Bank failed before the homes were finished. Tr. at 251–52.

706–07. On or about June 21, 2009, Mr. Doukas presented Mr. Bavelis with an agreement ("R.P.M. Agreement") by which Mr. Bavelis would, in return for $50,000, transfer his "50% interest in GMAQ" to R.P.M. Recoveries, Inc. ("R.P.M."), a New York corporation of which Mr. Doukas was president. Debtor's Ex. 131.[7] When he signed the R.P.M. Agreement, Mr. Bavelis believed that he was giving "him a larger percentage so that [Mr. Doukas] can be able to be more effective." Tr. at 707:7–9. Mr. Bavelis's understanding when he signed the R.P.M. Agreement was that the agreement was temporary and would be "coming right back to me . . . ." Tr. at 717:13. By signing such an agreement with the understanding that it would be returned to him, Mr. Bavelis demonstrated a high level of confidence in Mr. Doukas. According to Mr. Bavelis, at that time "I had already established a trust in Ted Doukas that we became very good friends and I would listen to him because he offered so many things that he was going to do for me." Tr. at 667:4–8. "He's going to help me in many respects. And I had no doubts about it at that time." Tr. at 667:8–9. "[H]e was my brother at the time. We had such a close relationship that I trusted Ted for anything he told me." Tr. at 685:23–686:1. As Mrs. Bavelis put it, "George and I had come to a point where anything he said we trusted him." Tr. at 391:20–21. Although Mr. Bavelis knew that Mr. Doukas—at least from the perspective of Mr. Albright and Mr. Vogel—had the potential to be a difficult person with whom to transact business, Mr. Doukas had not given Mr. Bavelis any reason not to trust him. In fact, by June 2009, Mr. Doukas had done two things he had told Mr. Bavelis that he

would do—purchase approximately $200,000 of stock in Sterling Holding and deposit $2 million in Sterling Bank.

**B. The QC Loan Documents**

**1. Representations Prior to Their Execution**

In June 2009, Mr. Bavelis firmly believed that Mr. Doukas was on his side and considered him a friend and brother in whom he could place the utmost confidence and trust. In fact, Mr. Bavelis trusted Mr. Doukas enough to sign and deliver a multimillion dollar promissory note—the QC Note—and the QC Loan Agreement and QC Security Agreement even though Quick Capital was lending Mr. Bavelis no funds.

Before Mr. Bavelis signed and delivered the QC Loan Documents, Mr. Doukas had promised that he would deposit $80,000 to $120,000 a month in Sterling Bank (in addition to the $2 million that he had deposited from his divorce). As Mr. Bavelis testified, this promise induced him to sign the QC Loan Documents. Tr. at 1059–60. Mr. Doukas's other promises—that he would work on Mr. Bavelis's behalf to resolve the issues with Mr. Qureshi and that he would purchase nonperforming Sterling Bank loans as well as the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis—factored into the inducement as well. Tr. at 736.

Mr. Doukas also promised Mr. Bavelis that he would help finalize Mr. Bavelis's estate planning. As Mr. Bavelis testified:

> [Mr. Doukas] was going to plan my estate. . . . [H]e needed about three to four months to try to help me to plan my estate. I had told him before . . .

**7.** The R.P.M. Agreement also provided that "Bavelis shall have the right to use the assets of MD Stat LLC an New York limited liability company and Leftheris Properties Corp. a

Florida Corporation for collateralizing any loans or financing that he may require." Debtor's Ex. 131 at BAV 00191. *See also* Tr. at 126–27.

that I have a trust but I have not funded it with any money. And he said, "George, I have done this before and I can help you with this thing." I said, "Yes, fine, Ted. I will need some help because I did my trust about six, seven years ago and I don't have, I mean I have not done the second or third part because there were two more parts to do that." … And then he said, "I can help you with this, I have done it." Not as a lawyer but as an individual to tell me what to do and how to put assets into this company, into this trust.

Tr. at 582:26–583:13. *See also* Tr. at 698:2–4 ("[H]e said he had a lot of experience about that and he's going to help me to plan my estate and finish up what needed to be done."). Because Mr. Doukas was not an estate planning attorney or other estate planning professional, the clear implication was that, at a minimum, Mr. Doukas had planned his own estate in the manner he was suggesting for Mr. Bavelis.

In addition to discussing estate planning generally, Mr. Doukas was specific, telling Mr. Bavelis that "it was going to be for the future, for my grandkids and my great-grandkids, I would form this perpetuity, perpetual something, I can keep my assets and not have to be planned from thereon. It was going to be done once and forever and he was going to help me do all those things." Tr. at 785:9–15. As Mr. Bavelis testified, the George A. Bavelis Trust ("Trust") was not funded "with any money," Tr. at 583:3, only with shares of stock of Sterling Holding. Tr. at 698–99.

Given Mr. Bavelis's awareness that Mr. Doukas was not an estate planning attorney or other estate planning professional, the idea that Mr. Bavelis would turn to Mr. Doukas for assistance in completing his estate plan might seem implausible. But it is not improbable that Mr. Bavelis,

whose brother had died just six months before, would be thinking about estate planning in June 2009. And there is considerable evidence (in addition to Mr. Bavelis's testimony) that Mr. Doukas did promise to help finalize Mr. Bavelis's estate plan. Mrs. Bavelis confirmed her husband's testimony that Mr. Doukas promised to assist Mr. Bavelis in this manner. Tr. at 394:3–8 ("[T]hey were talking one day and because they always talk about different things and George told him that he was planning his estate and he didn't have everything done. And Doukas volunteer that, 'Oh, I've done this before. I can, I can take care of that.'"). Mrs. Bavelis was specific that the offer was made "around June[,]" Tr. at 394:19, and that it occurred in connection with the QC Note. Tr. at 403:13–17 ("Yes, the note he was, George told him something about our estate that he had not finished and he said, 'Oh, don't worry, I've done that before, I can finish it up for you and you don't have to do anything, I'll take care of it.'"); 428:24–26 ("And then he also told him to sign a promissory note for his estate planning"). Mr. Bavelis gave Mr. Doukas a copy of The George A. Bavelis Revocable Trust Agreement dated October 18, 2004 ("Trust Agreement"), Quick Capital Ex. XX; Tr. at 583–85, and the Trust became a party to the QC Loan Documents, facts that are consistent with the notion that the QC Loan Documents related to estate planning.

Mr. Doukas advised Mr. Bavelis that, as part of the estate planning, he was "going to form a Nevada corporation because there were some advantages that Nevada corporations have[,]" Tr. at 584:16–17, including that "somehow people can't go and find out who the shareholders are or something like that." Tr. at 585:17–19. A few weeks after the execution of the QC Loan Documents, one of Mr. Doukas's attorneys

sent Mr. Bavelis an agreement that, if Mr. Bavelis had signed it, would have transferred certain of his interests in the Ohio Partnerships to the Nevada corporation that Mr. Doukas was proposing to form. It was not until after he signed the QC Loan Documents, however, that Mr. Bavelis received the proposed agreement transferring assets to the Nevada corporation and thus became uncomfortable with the concept of the particular Nevada corporation Mr. Doukas was suggesting.

In the summer of 2009, Mr. Bavelis believed that he did not have the ability to service any more debt. Tr. at 602. Consistent with that belief, before he signed the QC Loan Documents, Mr. Bavelis obtained a promise from Mr. Doukas that he would not be required to make payments on the QC Note. As Mr. Bavelis testified: "[W]hen I gave him this note for $14,000,000 I said, "Ted, you don't expect me to make payments for this thing?" He said, "No, no, no, you don't need to make payments." Tr. at 598:22–25.

Before Mr. Bavelis signed the documents, Mr. Doukas also represented to Mr. Bavelis that the QC Loan Documents would be returned when the estate planning was finalized. "He told me it would take three to four months when I signed this note, it would take me three to four months and then I give those papers back to you, George." Tr. at 584:9–12. Like the other representations Mr. Doukas had made to Mr. Bavelis up to that point, Mr. Doukas's statements that he would not seek payment and would return the QC Loan Documents after Mr. Bavelis's estate planning was completed were intended to induce Mr. Bavelis to sign the QC Loan Documents.

Mr. Doukas persuaded Mr. Bavelis not to consult his own attorney before signing the QC Loan Documents, which had been prepared by Mr. Doukas's Florida attorney and reviewed by another of Mr. Doukas's attorneys, John Stravato. Tr. at 274–75. Mr. Stravato and Mr. Doukas sent Mr. Bavelis a copy of the QC Loan Documents for his signature via email:

I remember receiving an email from John Stravato and another email from Doukas while I was in Columbus, Ohio. And they wanted to have this in a hurry. And I believe I signed them and I notarized them on Monday and overnight[ed] them directly to him on that day and he received them the next day.

Tr. at 718:7–13.

Mr. Bavelis did not consult his own longtime attorney, Michael Schaeffer, before he signed the QC Loan Documents, because Mr. Doukas advised him that he did not need to do so:

I had so much trust and faith in what Ted was telling me and I just felt he had done it so many times. In fact he told me he had an in-house lawyer in New York for about 10 years and he has learned a lot of those things. "George, I can help you with those things." Those are small little things I can take care of. You don't need to talk to your lawyer." And [I] took it for granted that he really was trying to help me and I was his brother, he would not do any harm to his brother.

Tr. at 590:14–23.

Mrs. Bavelis confirmed that her husband would not have sought his own attorney's advice under these circumstances. "At one point I remember George wasn't sure about something, I can't recall exactly what it was, and Ted said, 'Oh, don't worry, you don't need an attorney. I've done this before, I can, I can take care of it.'" Tr. at 400:25–27. "And I told George, I said, 'Well, if he's done all this he can do that also, you don't have to ask anybody.' I trusted the man." Tr. at 400:23–401:2.

## 2. The Contents of the QC Loan Documents

### a. The QC Note

Mr. Bavelis signed the QC Note in Columbus on June 22, 2009. Debtor's Ex. 73. He signed it twice, the first time in his individual capacity, the second as the trustee of the Trust. At the top, under the word "Note," appears the following text:

$14,000,000.00 June 21, 2009 Franklin County, Ohio.

The QC Note identifies the consideration as "FOR VALUE RECEIVED." It inconsistently states that the interest rate is "fourteen (5%) per annum" and then provides that the amount of interest is $58,333.33 per month, which equates to 5% per annum. The principal balance of $14 million was to be due on June 21, 2014. The QC Note states that it "may not be changed or terminated orally" and also contains the following text, which falls short of being a sentence: "IT IS EXPRESSLY AGREED, that the said principal sum secured by this Note shall become due at the option of the holder hereof on the happening of any default or event by which, under the terms of the Security Agreement securing this Note." Debtors's Ex. 73 at GB 003826.

As already discussed, the evidence presented at trial established that Mr. Doukas had represented to Mr. Bavelis that he would not be required to make the monthly interest payments or the $14 million principal payment due under the QC Note.

### b. The QC Loan Agreement

Mr. Doukas signed the QC Loan Agreement, Debtor's Ex. 76, as the president of Quick Capital. Mr. Bavelis signed it both in his individual capacity and as the trustee of the Trust, and it defines Mr. Bavelis in this dual role collectively as "GAB." After naming the parties, the QC Loan Agreement sets forth two recitals:

Whereas Quick has provided and will continue to provide consulting and management services in an effort to restructure various liabilities and troubled assets owned directly or indirectly by GAB; and

Whereas GAB as security for the payment of these services rendered and to be rendered agrees to provide a security interest for Quick in various securities in the amount of Fourteen Million ($14,000,000) Dollars[.]

Debtor's Ex. 76 at GB 004059. The QC Loan Agreement does not refer to the QC Note. The only reference in the QC Loan Agreement itself to any payment by GAB is the phrase "the payment of these services rendered and to be rendered," which appears in the second recital set forth above.

Following the recitals, Quick Capital "represents that it will make available to GAB the following corporations which can be used to collateralize loans during the restructuring and refinancing process: 4 Louden Ave Corp., Raelaur LLC, 2 Lisa Court Corp. and Aries Capital of L.I. Corp." Debtor's Ex. 76 ¶ 1.

In addition, the QC Loan Agreement states that Quick Capital "shall tender the sum of Two hundred Thousand ($200,000) Dollars to George A. Bavelis which he will accept on behalf of himself and as trustee of George A. Bavelis Trust No. 1, dated October 18, 2004." Debtor's Ex. 76 ¶ 2. There was no evidence presented during the trial establishing that the $200,000 sum would not actually be advanced or that Mr. Bavelis would not be required to repay any amount he actually borrowed.

The QC Loan Agreement provides that the parties would enter into the QC Security Agreement. It also states that "[i]t is acknowledged by the parties that all fees have been earned on a flat rate basis, the

sufficiency of the consideration by all parties is hereby acknowledged." Debtor's Ex. 76 ¶ 3. It contains a few boilerplate provisions, Debtor's Ex. 76 ¶ 4, 5, 8, a confidentiality clause, Debtor's Ex. 76 ¶ 6, and a provision making New York law the governing law, Debtor's Ex. 76 ¶ 7, followed by the signatures and notary blocks. That is all that is contained within the four corners of the QC Loan Agreement. Mr. Doukas, though, contends that the QC Loan Agreement also includes the following Schedule A:

### Schedule A

### Disbursements

Upon execution of Agreement—$200,000 downpayment

By December 31, 2009—not less than 10% of note (not including downpayment) must be advanced as cash.

Debtor's Ex. 76 at GB 004061; Tr. at 279.

Mr. Doukas's testimony regarding the existence of a Schedule A to the QC Loan Agreement lacks credibility for several reasons. First, the drafter of the QC Loan Documents clearly knew how to reference attached schedules. In fact, the QC Security Agreement—a separate document presented to Mr. Bavelis for signature at the same time he signed the QC Loan Agreement—included a reference to a different Schedule A than the one Mr. Doukas alleges was attached to the QC Loan Agreement. In this regard, the QC Security Agreement provided that Mr. Bavelis individually and as trustee of the Trust was granting to Quick Capital a security interest in 80,000 shares in Sterling Holding and 30 securities "annexed in schedule 'A'." QC Security Agreement ¶ 4. Despite the fact that the drafter of the QC Loan Documents knew how to refer to attached schedules in the text of agreements, the QC Loan Agreement does not reference Schedule A.

Second, the text of the QC Loan Agreement provides that Quick Capital shall tender $200,000, but says nothing about at least 10% of $14 million ($1.4 million) being advanced as cash. It is unlikely that parties would reference a $200,000 payment in the text of a loan agreement but leave a $1.4 million payment to a schedule that is not even referenced in the agreement.

Third, the two unsigned copies of the QC Loan Agreement that Mr. Stravato and Mr. Doukas sent to Mr. Bavelis the day before Mr. Bavelis signed it do not include a Schedule A. Debtor's Ex. 74–A; 74–B; Tr. at 277–279; 580–81. When confronted with this fact during the trial, Mr. Doukas suggested that he sent the QC Loan Documents to Mr. Bavelis for signature via Federal Express or some other overnight service, but he provided no evidence that he had done so. Tr. at 279–82. Fourth, the "not less that 10%" of the QC Note (i.e., not less than $1.4 million) all too conveniently approximates the $1,464,725 of funds that Mr. Doukas transferred from certain bank accounts maintained at Sterling Bank for the purchase of additional stock in Sterling Holding in September 2009 (of which more below)—transfers that Mr. Doukas now says were on behalf of Mr. Bavelis even though all the evidence is to the contrary. Mr. Bavelis characterized the contention that Schedule A was part of the QC Loan Agreement as "the big lie of the century." Tr. at 579. While the Court need not go that far, it finds that Mr. Doukas's testimony that the QC Loan Agreement included Schedule A was false.

In an attempt to call Mr. Bavelis's credibility into question, Mr. Doukas also made a false statement regarding Schedule A in his proposed findings of fact and conclusions of law ("Doukas Findings & Conclusions") (Doc. 245). He alleged that the purported existence of Schedule A shows that Mr. Bavelis filed a misleading declara-

tion in connection with a state court lawsuit that Quick Capital commenced in 2010 against Mr. Bavelis in the Supreme Court of New York, County of Nassau ("New York State Court") for amounts allegedly due under the QC Note ("Quick Capital Lawsuit"). Mr. Bavelis filed a notice of removal of the Quick Capital Lawsuit to the United States District Court for the Eastern District of New York ("New York Federal Court"). On June 23, 2010, Mr. Bavelis signed a declaration ("Bavelis Declaration") in which he stated, among other things, that he had "reviewed the Note and Security Agreement that are attached as Exhibit 1 to [his] Notice of Removal filed in this action." Quick Capital Ex. GG ¶ 2. Exhibit 1 to that notice of removal was the notice of motion for summary judgment in lieu of complaint that Quick Capital had filed in the New York State Court; attached to that notice of motion for summary judgment in lieu of complaint was an affidavit by Mr. Doukas in which he referenced the QC Note and the QC Security Agreement (which were attached as exhibits to the affidavit), but did not reference or attach as an exhibit the QC Loan Agreement. *See* docket of New York Federal Court, Case No. 10–2759 (Doc. 1 at 10–22).[8] Mr. Bavelis did not state in the Bavelis Declaration that he had reviewed the QC Loan Agreement. That makes sense, because the QC Loan Agreement was not attached to Quick Capital's notice of motion for summary judgment in lieu of

complaint and therefore was not attached as Exhibit 1 to Mr. Bavelis's notice of removal. Despite this, in his proposed findings, Mr. Doukas makes much of that fact that "[t]he June 23, 2010 Affidavit [that is, the Bavelis Declaration] did not contain any mention of the defense raised in this Court that the Loan Agreement … did not contain Schedule A." Doukas Findings & Conclusions ¶ 16.

Mr. Doukas then stated in his proposed findings that "the Loan Agreement that was filed as an Exhibit to the Complaint did, in fact, contain Schedule A, as an exhibit to the Loan Agreement." Doukas Findings & Conclusions ¶ 17. This statement is not true. As noted above, the document Mr. Doukas filed in the New York State Court was a motion for summary judgment in lieu of a complaint, not a complaint. Much more importantly, that motion did not include the QC Loan Agreement as an exhibit. A motion that Mr. Doukas later filed (on July 6, 2010) in the Quick Capital Lawsuit did include an affidavit that in turn included a copy of the QC Loan Agreement with a Schedule A attached. *See* docket of New York Federal Court, Case No. 10–2759 (Doc. 5, Attachment 2, Ex. E). The Bavelis Declaration, however, was dated June 23, 2010 and therefore clearly was in response to the notice of motion for summary judgment in lieu of a complaint, which did not include the QC Loan Agreement.[9]

8. Although the notice of motion for summary judgment in lieu of complaint and the later motion filed by Quick Capital in the Quick Capital Lawsuit were not submitted by the parties as exhibits during the trial, the Court may take judicial notice of the contents of the record of the New York Federal Court in the Quick Capital Lawsuit. *See In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 213 n. 7 (Bankr. S.D.Ohio 2008); *Schafer v. Rapp (In re Rapp)*, 375 B.R. 421, 426 n. 4 (Bankr.S.D.Ohio 2007).

9. Mr. Bavelis's proposed findings of fact and conclusions of law ("Bavelis Findings & Conclusions") (Doc. 246) are themselves not without error. For example, those findings state that Mr. Doukas promised, among other things, to contribute funds "to capitalize Sterling Bank," Bavelis Findings & Conclusions ¶ 63, and then states that "[n]one of these promises were ever fulfilled," *id.* ¶ 65 and that "Ted Doukas never did anything, other than continually making promises that he would at some future point." *Id.* ¶ 82. As

Mr. Doukas also attempted to paint the Bavelis Declaration as misleading because in it Mr. Bavelis stated that Mr. Doukas "represented to me that my assets would be protected if I executed the Security Agreement and the Note," Quick Capital Ex. GG ¶ 11, while saying nothing about estate planning. However, although the Bavelis Declaration did not mention estate planning, the Bavelis Declaration is not inconsistent with Mr. Bavelis's testimony during the trial that the QC Loan Documents related to the planning of his estate. Tr. at 784–85. In short, Mr. Bavelis did not file a false declaration in the Quick Capital Lawsuit, and Mr. Doukas's suggestion otherwise is itself misleading.

### c. The QC Security Agreement

Mr. Bavelis signed the QC Security Agreement on his own behalf and on behalf of the Trust on June 22, 2009. Debtor's Ex. 77. The QC Security Agreement states that "[f]or value received" Mr. Bavelis individually and as trustee of the Trust grants to Quick Capital a security interest in certain shares in Sterling Holding and securities referenced in a schedule that is referred to as Schedule A. QC Security Agreement ¶¶ 2, 4. The QC Security Agreement states that it "secures the payment and performance of: (a) all obligations pursuant to [the QC Loan Agreement and the QC Note]." QC Security Agreement ¶ 3. Defaults would include, among other things, "another secured party or judgment creditor exercis[ing], or attempt[ing] to exercise or giv[ing] notice of its intention to exercise its rights against the Collateral." Id. ¶ 9. It was not inconceivable that such a default might occur given that the assets subject to the QC Security Agreement had previously been pledged to other entities. Tr. at 585.

explained below, in September 2009, Mr. Doukas purchased approximately $1.4 million

In particular, the securities identified on the Schedule A to the QC Security Agreement were pledged as collateral for the various credit facilities extended by Fifth Third, Tr. at 586, and the shares in Sterling Holding had been pledged to another lender. Tr. at 586.

### 3. The Consideration for the QC Loan Documents

Mr. Doukas contends that, in addition to the $200,000 and "not less than" $14 million of cash, the consideration for the QC Note included other promises, some of which are mentioned in the QC Loan Agreement and some of which are not. First, there was the promise to make assets available to secure loans to effectuate a restructuring of Mr. Bavelis's liabilities and the troubled assets owned by Mr. Bavelis and the Trust. Mr. Bavelis believed that he did not have the ability to service any more debt, Tr. at 602, so the parties' understanding was that Mr. Doukas himself would use the assets to obtain loans in his own name in order to purchase the Colonial Bank and First Southern loans, as well as the Sterling Bank nonperforming loans. Tr. at 109:24–25 (Mr. Doukas characterizing the QC Loan Agreement as imposing "my obligations on the note to pledge as many assets as I can"). As explained in the next section, no such benefit materialized.

Mr. Doukas was, he testified, personally obligated to make all of his assets—not just those that were the subject of the QC Loan Agreement—available to Mr. Bavelis:

Q. Mr. Doukas, were assets made available to Mr. Bavelis that . . . were

of stock in Sterling Bank on his own behalf.

not included in this QC Loan Agreement of June 21st, '09?

A. Yes.

Q. And tell us what any of those assets were?

A. Anything I have on the financial statements, anything that I own because I own all these companies 100%.

Q. And did you tell that to Mr. Doukas, excuse me, Mr. Bavelis?

A. Yes, he knew about that.

Tr. at 889:1–13. *See also* Tr. at 109:24–25 (Mr. Doukas characterizing the QC Loan Agreement as imposing "my obligations on the note to pledge as many assets as I can"). Mr. Doukas also testified that he was prohibited by his agreement with Mr. Bavelis from pledging his assets for any purpose other than assisting Mr. Bavelis. However, as Mr. Doukas himself conceded, Tr. at 269–72, the QC Loan Agreement did not impose that restriction.

Mr. Doukas himself had no binding obligation to make assets available under the QC Loan Agreement. The only entity affiliated with Mr. Doukas that was a party to the agreement—Quick Capital—owned none of the assets that were to be made available to Mr. Bavelis. Tr. at 44. Those assets—the corporations 4 Louden Ave. Corp. ("Louden"), Raelaur LLC ("Raelaur"), 2 Lisa Court Corp. ("Lisa Court") and Aries Capital of L.I. Corp. ("Aries Capital")—were solely owned by Mr. Doukas, Debtor's Ex. 241; Tr. 39–44; 50–51, but Mr. Doukas personally was not a party to the QC Loan Agreement. That also was the case with the R.P.M. Agreement, under which the assets of MD Stat LLC and Leftheris Properties Corp. were pledged. Debtor's Ex. 131. Mr. Doukas

owned R.P.M. (the only Doukas party to the R.P.M. Agreement), Debtor's Ex. 241, but R.P.M. did not own MD Stat LLC or Leftheris Properties Corp. Those corporations were solely owned by Mr. Doukas, Debtor's Ex. 241; Tr. 39–44; 50–51, who was not a party to the R.P.M. Agreement. In other words, under the QC Loan Agreement, as well as the R.P.M. Agreement, Mr. Bavelis purportedly had the right to use assets based on an agreement with an entity that did not own the assets, while the owner of the assets—Mr. Doukas—personally had no contractual obligation to make them available.[10]

In addition to providing funds and making assets available, his obligations under the QC Loan Agreement, Mr. Doukas testified, included purchasing nonperforming loans held by Sterling Bank:

[I]t was the agreement that we had, you know, how to raise money for the, you know, for the bank. But to get the nonperforming loans that was even more important because the banks if you take the nonperforming loans out then you're increasing the capital and then you don't have a lot of problems. That was a big issue. And what we were doing we were pledging this, these assets that were taking nonperforming loans and now we have the bank to, direction to go up.

Q. And was that the overall intent of all these agreements in June of '09?

A. Yes.

Tr. at 891:21–892:9.

Furthermore, Mr. Doukas testified that the consideration under the QC Loan Agreement included his promise to provide

---

10. Mr. Doukas is the sole shareholder/member of Lisa Court; Louden; Aries Capital; Blair; Leftheris Properties Corporation; M.D. Stat, LLC, Quick Capital; R.P.M. and Raelaur. In turn, Aries Capital is the sole share-holder of Efastos Corp., Opa Opa and WKYA Holdings Corp. ("WKYA"). The sole share-holder of Nemesis is either Ted Doukas or Aries Capital. Debtor's Ex. 241; Tr. at 39–44; 50–51.

consulting and management services, which he valued at approximately $500,000, even though the QC Loan Agreement does not specify the value. Tr. at 327–28. Mr. Doukas also testified that the consulting services were for three items: (1) to restructure the loans with Colonial Bank and First Southern, Tr. at 285; (2) to acquire nonperforming loans from Sterling Bank; and (3) to buy out Mr. Qureshi and indemnify Mr. Bavelis. Tr. at 290.

## C. Events Occurring After the Execution of the QC Loan Documents

Events occurring (or failing to occur) during the seven months after the QC Loan Documents were signed make it clear that Mr. Bavelis repaid the funds that Nemesis advanced to him; that neither Mr. Doukas nor any of his companies provided the other consideration allegedly supporting the QC Loan Documents; that Mr. Doukas made several representations that fraudulently induced Mr. Bavelis to sign the QC Loan Documents; and that Mr. Doukas personally has no claim against Mr. Bavelis based on Mr. Doukas's purchase of stock in Sterling Holding.

### 1. The Repayment of All Amounts Actually Advanced

After a dinner at the Bavelises' Florida home that took place in early July 2009, Mr. Doukas gave Mr. Bavelis a $250,000 check dated June 21, 2009. Debtor's Ex. 102; Tr. at 720. Mr. Doukas testified that the amount of the check included the $200,000 that was to be advanced under the QC Loan Agreement, Tr. at 49:19–22, as well as $50,000 under the R.P.M. Agreement. Tr. at 861. In the Bavelis Findings & Conclusions, Mr. Bavelis states that "the circumstances under, and purposes for which, Ted Doukas elected to deliver a check in the amount of $250,000, from Nemesis, to Mr. Bavelis are peculiar to

stay the least," Bavelis Findings & Conclusions ¶ 169, presumably in part because "[t]he check itself was dated June 21, but the record is undisputed that it was not delivered during that time frame." Id. There was nothing peculiar about the timing. The R.P.M. Agreement and the QC Loan Agreement were dated June 21, 2009. It appears that Mr. Doukas, rather than mailing the check to Mr. Bavelis (who was in Ohio when he signed the R.P.M. Agreement and the QC Loan Documents), simply waited to deliver the check in person.

The check was drawn on an account maintained not by Quick Capital or R.P.M., but instead on an account maintained by Nemesis. Mr. Bavelis apparently was surprised when Mr. Doukas gave him the $250,000 check, because Mr. Doukas had represented that no payments would be due under the QC Note and had promised that the QC Loan Documents and the R.P.M. Agreement would be returned. Mr. Bavelis's surprise was not entirely warranted. After all, there was no evidence of an agreement that the $50,000 payment under the R.P.M. Agreement would not be made. Likewise, although Mr. Doukas had promised Mr. Bavelis that he would not be required to make the monthly interest payments or the principal payment due under the QC Note, there was no testimony establishing that $200,000 would not be borrowed under the QC Loan Agreement or that Mr. Bavelis would not be required to repay any amount actually advanced.

Consistent with an understanding that $200,000 would be advanced under the QC Loan Agreement, on the memo line of the check Mr. Doukas wrote words that, although difficult to read, appear to be "Consideration on the Note." Mr. Bavelis attempted to refuse the check, but Mr. Doukas insisted he take it. Mr. Bavelis

accepted the $250,000 check and deposited it into one of his accounts. Tr. at 594. He then promptly repaid it:

> Later on within a month or so, I went back and wrote two checks, again we had dinner at my house, I told him, "Ted, here is the money that you loaned me." He said, "George, don't worry about it, don't worry about it." I said, "Ted" in fact I said, [in Greek] ... the good transactions make the good friends. And I told him that in Greek. And I said, "Please take the money." He said, "No, George, don't worry about it, don't worry about it." So I was bothered by that statement, don't worry about it, don't worry about it. So I went to the bank and I gave the checks to the bank and I said, "Please deposit into his account." And I wrote on the checks, "Loan return." I return the loan.

Tr. at 720:18–721:8. To be more precise, Mr. Bavelis issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $100,000; the check was dated July 14, 2009 and posted on July 27, 2009. The memo line indeed states "Return Loan." *See* Debtor's Ex. 96, IB/DOU 0004; Debtor's Ex. 107. Mr. Bavelis also issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $150,000; that check was dated July 27, 2009 and posted on August 17, 2009. The memo line on that check also states "Return Loan." Debtor's Ex. 96, IB/DOU 0006; Debtor's Ex. 103 at GB 003837; Debtor's Ex. 108; Tr. at 595–98. Mr. Doukas refused to accept the checks personally, but Mr. Bavelis caused them to be posted to an account Mr. Doukas maintained at Sterling Bank. Tr. at 594–98; Debtor's Ex. 102. To be clear, even though Mr. Bavelis was the party to the QC Loan Agreement, he repaid the loan using funds borrowed from Pella Financial Services, the issuer of the checks, Tr. at 774–76, just as Mr. Doukas

had made the loan through an entity (Nemesis) that was not a party to the QC Loan Agreement.

Mr. Doukas asserts that the $250,000 payment Mr. Bavelis made to him by means of the two checks had nothing to do with the QC Note, that instead the payment fulfilled an oral side deal under which Mr. Bavelis agreed to pay Blair $50,000 per deed for the five Glenn Wright Co. lots that had not yet been sold. Tr. at 76–77; 296–300; 899–901. In support of this assertion, Mr. Doukas testified that, because Glenn Wright Co.'s loan with Sterling Bank was nonperforming, on March 30, 2009, Blair became the obligor on a $3,567,000 promissory note (representing the amount owed by Glenn Wright Co.) and that Mr. Doukas guaranteed Blair's obligations under the note. Tr. at 895:7–900:14; 931:6–12; 933. Quick Capital offered Exhibits BBBBB and FFFFF in support of Mr. Doukas's testimony. According to Mr. Doukas, Exhibit BBBBB, in the words of his counsel, "purports to be an amended and restated promissory note dated March 30, 2009 in the amount of $3,567,000[,]" Tr. at 895:7–13, a note that included a signature by Mr. Doukas on behalf of Blair and a guarantee by Mr. Doukas. Tr. at 896:15–897:6. Exhibit FFFFF, Mr. Doukas contends, is, again in the words of his counsel, "an escrow agreement purportedly between Blair International as borrower, mortgagor, Sterling bank and a law firm in Ft. Lauderdale, Florida." Tr. at 897:10–14. The escrow agreement purportedly was signed by Mr. Doukas and Mr. Albright, Tr. at 897:18; 898:2–6, and allegedly provided for the quitclaim deeds to the five Glenn Wright Co. lots to be placed into escrow. Tr. at 898:15–18. By an agreed order entered after the trial (Doc. 201) ("Agreed Order"), the parties agreed that the Court would reserve ruling on the admissibility of Ex-

hibits BBBBB and FFFFF to allow Quick Capital an opportunity to obtain certified copies of the exhibits; the certified copies were intended to establish that the Blair note and escrow agreement were served on Mr. Doukas in connection with litigation pending in a Florida state court, that such service was made only shortly before the trial on the Proofs of Claim had commenced, and that the exhibits therefore should be admitted into evidence despite not being produced to Mr. Bavelis prior to trial. Quick Capital did not file certified copies of the documents, leaving Mr. Doukas's testimony as the only evidence of the note issued by Blair and the guarantee provided by Mr. Doukas.

Quick Capital contends that "[t]he only rational reason Doukas/Blair would be willing to undertake liability on a $3,567,000 construction loan" while "relinquish[ing] all control of construction and profit at sale" and "simultaneously deed[ing] the five homes to a bank representative at closing would be that Doukas/Blair had an agreement to be paid for these transactions." Doukas Findings & Conclusions ¶ 146. If so, that is not how Mr. Doukas represented the transaction to Mr. Bavelis. In February 2009, Mr. Doukas had sent Mr. Bavelis an email regarding the five Glenn Wright Co. lots, stating that Mr. Doukas's actions with respect to the matter were motivated by the fact that "we are friends for life." Debtor's Ex. 44. Mr. Bavelis testified, and the Court finds, that Mr. Bavelis was unaware of the purported note and guarantee until Mr. Doukas stated during the trial that Blair had issued the note and that Mr. Doukas had guaranteed it. Tr. at 660:9–24. Thus, there would have been no reason for Mr. Bavelis to believe that Mr. Doukas expected to be compensated for his involvement in the Glenn Wright Co. matter, and certainly no reason for Mr. Bavelis to believe that Mr.

Doukas expected any such compensation to come from Mr. Bavelis.

Quick Capital further argues that Mr. Bavelis's "testimony requires the Court to conclude that Doukas/Blair actions were virtually philanthropic in nature—done for no consideration, provided no 'upside' profit potential, and incurring only 'downside liability' on the loan." Id. ¶ 147. But any such "downside liability" was perhaps less so if Mr. Doukas never intended that he or Blair would satisfy the liability. In this regard, it bears noting that a deficiency judgment in excess of $3 million based on the liability under the note eventually was entered against Blair. Tr. at 902:16–20. In the end, even if Mr. Doukas's testimony regarding Blair's liability on the note and the subsequent deficiency judgment is accurate, that testimony is not in Quick Capital's favor, but instead provides another example of a situation in which Mr. Doukas and one of his companies failed to perform.

There simply is no evidence supporting Mr. Doukas's assertion that Mr. Bavelis paid $250,000 in order to satisfy an oral side agreement between Mr. Doukas and Mr. Bavelis with respect to the five Glenn Wright Co. lots. Indeed, all the evidence is to the contrary. The memo lines on both of Mr. Bavelis's checks state "Return Loan." Mr. Bavelis adamantly denied that the checks were in payment for the Glenn Wright Co. deeds, Tr. at 476–481, testifying that there were no discussions along those lines and that he would never make such payments. Tr. at 481:9–13 ("Absolutely not. The first time I saw something like $50,000 for a house was back in 2010. I never heard of anything like that. A director in my position to bribe someone, that's unheard that, that's absurd."). See also Tr. at 512. Mr. Doukas testified that receiving $250,000 from Mr. Bavelis in exchange for the fives deeds "was a business

transaction," Tr. at 901:17, even though in February 2009 he had sent Mr. Bavelis an email stating "i want you to minimize your loses and i am doing this because we are friends for life." Debtor's Ex. 44 at GB 000834. In fact, an email Mr. Doukas had sent on June 2, 2009 advising Mr. Bavelis that "all the liens were settled with the five houses," Debtor's Ex. 57 at GB 000501, was forwarded by Mr. Bavelis to another person, and in the forwarding email Mr. Bavelis referred to Mr. Doukas as his "friend" three times. Debtor's Ex. 57 at GB 000501; Tr. at 571. It seems improbable that the close relationship between Mr. Bavelis and Mr. Doukas would have continued if Mr. Doukas had requested $250,000 from Mr. Bavelis personally in exchange for deeds on properties securing defaulted loans held by Sterling Bank.

Moreover, the notion that the $250,000 was income to Blair is inconsistent with the evidence produced at trial with respect to the non-filing of income tax returns. Mr. Doukas never produced any evidence that he, Blair or any of his other companies reported $250,000 of income on any income tax returns on account of a transaction with Mr. Bavelis. Tr. at 76–77. Nor is there any evidence that Mr. Doukas or any of his companies reported on any tax returns the interest income he testified he received from Mr. Bavelis when, at Mr. Doukas's request, Mr. Bavelis issued Quick Capital two checks drawn on the account of Bavelis Financial Services, one dated July 28, 2009, the other dated August 28, 2009, each in the amount of $58,300. *See* Debtor's Ex. 104.

Mr. Bavelis described the $58,300 checks as follows:

[A]fter Mr. Doukas apparently received his monthly statement he saw that I did deposit the money in there. He came to my house, we had dinner. And before he left, again we got up for

him to leave, he said, "By the way, George, give me a couple of checks." I said, "How much?" He said "$58,300 each." So I gave him two checks, [$]58,-300. And I didn't think, I thought it was just planning of my estate. That's what I considered it to be. I didn't ask any questions.

Tr. at 598:7–16. Mr. Doukas advised Mr. Bavelis that he would return the checks, Tr. at 598–99, but there is no evidence that he ever did.

Mr. Doukas characterized the two $58,300 payments as interest payments under the QC Note. But while conceding that Quick Capital should have reported this purported interest income on its tax return for 2009, Tr. at 75–76, Mr. Doukas provided no evidence that it had been so reported. He did not produce a tax return for Quick Capital for 2009, instead stating only that he would have produced it if it had been prepared and suggesting that he still (in 2012) had an extension for the filing of Quick Capital's 2009 tax return. Although Mr. Doukas represented to the Bavelises that he was working directly with the FBI and, as explained below, the Federal Deposit Insurance Corporation ("FDIC"), he apparently left any contacts with the IRS to his accountant. He testified that he needed to ask his accountant to confirm that Quick Capital still had an extension in 2012 to file its 2009 tax return, but Mr. Doukas never provided such confirmation on the record. Tr. at 75–76.

In sum, the Court concludes that, whether it was $200,000 or $250,000, the entire amount that Nemesis lent to Mr. Bavelis was repaid and that any payment that Nemesis made on behalf of R.P.M. under the R.P.M. Agreement also was repaid.

## 2. The Nevada Corporation

As already discussed, Mr. Doukas first mentioned the formation of a Nevada cor-

poration to Mr. Bavelis in connection with estate planning and the execution of the QC Loan Documents. Tr. at 584–85. The name of the corporation was TNS Holding Corp. ("TNS"). Tr. at 309. During the trial, Mr. Doukas disclaimed knowledge of TNS. Tr. at 309–12. There is abundant evidence, however, that Mr. Doukas was intimately aware of and interested in TNS. A few weeks after the QC Loan Documents were signed, one of Mr. Doukas's attorneys, Mr. Stravato, sent an email to Mr. Doukas and Mr. Bavelis attaching an agreement entitled Assignment of Interests in Partnerships. Had he signed that agreement ("TNS Agreement"), Mr. Bavelis would have assigned his interests in 22 of the Ohio Partnerships to TNS. Debtor's Ex. 87; Tr. at 587. Mr. Doukas also forwarded the same email to Mr. Bavelis. Debtor's Ex. 87; Tr. at 309–311. Mrs. Bavelis confirmed that it was not her husband, but instead was Mr. Doukas, who wanted Mr. Bavelis to form TNS and transfer assets to it. Tr. at 409. On the draft of the articles of incorporation for TNS, the Florida address for Mr. Doukas appeared in the box for the incorporator even though the incorporator was identified as Mrs. Bavelis. Debtor's Ex. 83 at GB000042; Tr. at 313:4–9; 314:1–15; 586. Mr. Bavelis did not know the persons identified as the directors of TNS. Tr. at 588–89.

On November 21, 2009, Mr. Doukas forwarded to Mr. Bavelis an email that had been sent to Mr. Doukas on July 6, 2009 regarding the incorporation of TNS. Debtor's Ex. 92 at GB 001264. With respect to that email, Mr. Doukas testified as follows:

> Q. Look at Exhibit 92 please and . . . there's two emails, the one at the bottom appears to be an email from Fran Autumn to among others Ted Doukas, right?
>
> A. Yes.

> Q. Dated July 6, 2009, correct?
>
> A. Yes.
>
> Q. And the subject of that email is TNS Holding Corporation, correct?
>
> A. Yes.
>
> Q. It says, "Ted, still waiting for the signed page to be sent back to me for filings." Do you see that?
>
> A. Yes.
>
> . . . .
>
> Q. So Fran Autumn has a company that allows you to establish corporations?
>
> A. Yes and I gave the name to anybody when they open a corporation. I said she's very good. She's doing the job very well. So, yes, I know Fran.
>
> Q. And then the email that is dated July 6, 2009 you had reforwarded to Mr. Bavelis on November 21, 2009 at 10:16 a.m., do you see that?
>
> A. What is that, what exhibit?
>
> Q. At the top of the page.
>
> A. I forwarded to Mr. Bavelis, yes.
>
> Q. Okay, so you apparently gave the name to—of this lady to Mr. Bavelis plus you sent reminder notices to Mr. Bavelis about the formation of TNS Holding Corporation, the company you said you knew nothing about?
>
> A. He wanted to, he wanted to have a corporation, so I gave the name to order a corporation and that lady sent me a copy. It was not my corporation, it was his corporation, so I don't know anything about TNS Holding, what's it doing or anything, it was his business.
>
> Q. So it wasn't important for you that it was getting filed?
>
> A. For me it was he sent an email and I sent it back to say look at what she send me here. She wanted to sign some papers but it was not my business, it was not my corporation.

Q. Okay, not your business, not your corporation. Did you care one way or the other whether Mr. Bavelis actually signed that document then, apparently not, right?

A. He ordered a corporation so it was, they sent me a copy of that email and I forwarded it to him, there's nothing wrong with that.

Q. Okay. My question is did it matter to you one way or the other whether or not Mr. Bavelis proceeded forward in completing the incorporation of the Nevada corporation?

A. It was his business. It was his decision, it was not mine.

Q. Did it make any difference to you?

A. No difference.

Tr. at 314:17–317:9. *See also* Debtor's Ex. 92. Mr. Doukas provided no explanation for why it occurred to him on November 21, 2009 to forward an email that he had received more than four months earlier regarding a subject that purportedly meant nothing to him. On December 8, 2009, Mr. Doukas sent another text message to Mr. Bavelis forwarding an email he received that same day regarding the filing of TNS in Nevada, stating "George follow up with this to be file." Debtor's Ex. 93 at GB 001262. *See also* Tr. at 317–18. Mrs. Bavelis recalled that Mr. Doukas pushed the formation of TNS and reminded her husband to take the steps necessary to form the company. Tr. at 409–10.

Mr. Bavelis was uncomfortable with the idea of signing the TNS Agreement because he did not recognize the names of the proposed directors and because Mr. Doukas's home address was used for the address of the incorporator. Tr. at 588–89. For the first time, he decided not to do something suggested by Mr. Doukas. He did not, however, advise Mr. Doukas of this decision, but instead "was postponing as much as I could." Tr. at 589:4–5. Over the course of the next several months, Mr. Bavelis would have other reasons to be uncomfortable with Mr. Doukas.

### 3. The Promised Deposits

The parties did not testify that monthly deposits of $80,000 to $120,000 formed part of the consideration for the QC Loan Documents, but those promised deposits were part of the inducement that persuaded Mr. Bavelis to sign the documents. Tr. at 1059–60. Mr. Doukas, however, never deposited $80,000 to $120,000 a month into accounts maintained at Sterling Bank. He conceded that he failed to do so, Tr. at 951, and the evidence shows that any deposits he made of income from his companies were relatively small. Tr. at 960–62. In an effort to make it appear that he deposited substantial income from his companies into Sterling Bank, Mr. Doukas testified that Nemesis deposited $270,000 of rent checks into accounts maintained at Sterling Bank on May 22, 2009. Having previously testified that this amount was entirely from his divorce, Tr. at 944, he revised his testimony to state that this amount was from income received by one of his companies, Efastos Corp. He did not, however, produce a federal income tax return substantiating such income. Tr. at 951–55. Faced with these discrepancies, Mr. Doukas testified that he in fact was depositing funds into accounts maintained at banks other than Sterling Bank. Tr. at 962–67.

The evidence also demonstrates that neither Mr. Doukas nor his companies had the ability to make deposits at the promised level. A deposit of $80,000 per month for the six remaining months of 2009 after the QC Loan Documents were executed would have equated to a deposit of $480,000 in 2009. The tax returns that Mr. Doukas and his companies produced, however, demonstrate that the net income (after cash expenses) for Mr. Doukas and

his companies was approximately $176,630 for the entire year of 2009. Debtor's Exs. 186, 188, 192, 195, 198, 209, 213 & 218. In other words, at the time Mr. Doukas promised to cause deposits of $80,000–$120,000 a month to be made into Sterling Bank, he knew that he had no ability to fulfill the promise. Like Mr. Doukas's tax returns for 2009, tax returns for 2008 would have revealed an inability to make the promised deposits. Debtor's Ex. 187, 191, 197, 206, 212, 217; Tr. at 679–80. But Mr. Bavelis did not know in June 2009 that Mr. Doukas lacked the ability to make the promised deposits, because Mr. Bavelis did not review the tax returns that Mr. Doukas had delivered to him to give to Mr. Albright.

### 4. The Purchase of Additional Shares in Sterling Holding

Mr. Doukas contends that he performed under the QC Loan Agreement by purchasing more than $1.4 million of stock in Sterling Holding on Mr. Bavelis's behalf. The evidence shows, however, that Mr. Doukas purchased the stock on his own behalf. As already discussed, Mr. Doukas had purchased more than $200,000 of shares in Sterling Holding in March 2009, and in May of that year advised Mr. Bavelis that he might invest as much as an additional $3 million, resulting in warnings from both of the Bavelises and a statement by Mr. Doukas to Mrs. Bavelis that "I take my chances and I always win." Tr. at 408:5.

The efforts to increase the capital of Sterling Bank were continuing in July 2009. On July 29, 2009, Mr. Albright sent an email to Mr. Bavelis and the other directors of Sterling Bank regarding a potential investment of capital by two people who were not shareholders at that time. In that email, Mr. Albright stated that he felt "strongly that having them part of the Sterling Bank family would be very positive for all of us[,]" while recognizing "that dilution is not good for any of us." Debtor's Ex. 59 at GB 001447–48. The next day, Mr. Bavelis forwarded the email to Mr. Doukas and made the following plea:

> Please take a look at what David is trying to do; he is trying to take our bank and give it to his friend. Leftheri, you have helped me a lot so far and I will never forget it. I NEED YOUR HELP TO STOP HIM SHORT of his selfish action. I have no use for his 25 million to make this a great bank and get back to where we were before this financial downturn. I would need your help to raise at least 10 million this year but not less than 5 million in August and middle of September. If we can raise the total amount of 10 million before the end of September it will help a lot. Then we can take our time and raise 2–3 million before June of next year. I sincerely believe that [with] that much capital the bank will be on its way back to where I am used to operating my banking business. Please let me know if I need to meet with you and or any one else any where in the world to stop David short from bringing his friend in and taking over the bank that I worked so hard to create. I can assure you the potential is great with this bank and there is a lot of money to be made here on it if I get the capital that I need.

Debtor's Ex. 59 at GB 001447.

That same day, Mr. Doukas responded to Mr. Bavelis regarding Mr. Albright: "george my brother we will not let anybody take our bank. i knew he was not a good person and he wanted to take you out. i will not let him me and you we have to get him out. i will call you tomorrow. i went to greece for ten days . . . ." Debtor's Ex. 59 at GB 001447. Mr. Bavelis ex-

plained Mr. Doukas's reference to "our bank" as follows:

> [W]e had long conversations and long discussions with him that we were going to take the majority of this bank, probably 80 or 90% between the two of us. Because we were going to put a lot of money when the bank needed the money, approximately, I'm saying here 10,-000,000 but we're talking about 12,000,-000, what the regulators told us to do. In fact we talked about him becoming as much shareholder as I am.

Tr. at 574:21–575:8.

On August 7, 2009, Mr. Bavelis, as chairman of the board of Sterling Holding, sent a letter to its shareholders (including Mr. Doukas), stating in part as follows:

> Sterling Bank, like a high majority of the banks in Florida, has been coping with the troubled loans so far and a written agreement has been reached between the Bank, the Federal Reserve and the State of Florida that we must reserve additional funds for reserves and further increase our capital ratios even though we have always been in the "well capitalized" category. In an effort to comply with the regulators requests and increase our regulatory ratios to the unprecedented higher ratios, the Board of Directors unanimously approved raising $12,600,000 new capital, primarily from the existing shareholder[s] through the end of the month, on a prorata basis at $100 per share for Class A and $80 per share of Class B and any shareholder may purchase any additional Common Shares of Class A or Class B for the same pro rata after August 31, 2009. Class A Shares are voting and Class B Shares are non-voting but the shareholder distributions of both classes of shares will be the same as soon as our bank begins distributing money again with the permission of our regulators

> which we hope to be sometime in a year or two.

Debtor's Ex. 116. Along with the letter Mr. Bavelis sent a subscription agreement (Debtor's Ex. 117), a confidential private placement memorandum (Debtor's Ex. 118) and an annual report (Debtor's Ex. 120). Tr. at 149–151. Like the other shareholders of Sterling Holding, Mr. Doukas was sent a copy of these materials, including the private placement memorandum. Tr. at 150–51; 745:14–25. Mr. Bavelis also gave Mr. Doukas a copy of the private placement memorandum, Tr. at 745:14–25, and Mr. Bavelis discussed the private placement memorandum with Mr. Doukas. Tr. at 746:3–14. The private placement memorandum provided a "Notice to Florida Residents" stating that the securities had not been registered and that all persons purchasing the securities in Florida had a three-day right of rescission under Fla. Stat. Ann. § 517.061(11)(a)(5). Debtor's Ex. 118 at iv.

Although Mr. Doukas did not sign a subscription agreement, during a telephone call on the morning of September 23, 2009, he informed Mr. Fritz that he wished to purchase stock in Sterling Holding, referencing the price for the Class B shares. Tr. at 149–56; 199–201. He did not state that he was purchasing the stock on behalf of Mr. Bavelis or anyone else, Tr. at 154:12–16, or that he was making a loan to Mr. Bavelis. Tr. at 154:17–19. Around noon that same day, Mr. Fritz sent Mr. Doukas an email confirming the substance of this conversation. Tr. at 154–58. The email stated as follows:

> Mr. Doukas:

> Please confirm the following based on our phone conversation this morning.

> I am transferring monies from the following accounts into Sterling BancGroup, Inc. in order to buy company stock on your behalf.

$45,600 from … Leftheris Properties Corp.

$199,275 from … Leftheris Ted Doukas

$919,095 from … Nemesis of L.I. Corp.

$500,030 from [a certificate of deposit issued to] … WKYA Holdings Corp (This CD is currently pledged for a line of credit that will now be closed based on using the funds from this CD for purchasing company stock)

The total amount being transferred into Sterling BancGroup, Inc. to purchase stock is: $1,664,000.00

Please confirm that you agree and approve all of the above transactions.

Thank you

Moyle Fritz

Debtor's Ex. 121 at GB004014. *See also* Tr. at 57–60.

In his email, Mr. Fritz twice stated that Mr. Doukas's funds were being transferred into a Sterling Holding account; Mr. Fritz in no way indicated that the funds were being transferred on Mr. Bavelis's behalf. Mr. Fritz also twice stated that the funds were being transferred for the purpose of purchasing stock in Sterling Holding; in one of those instances Mr. Fritz made clear that the purpose was to "to buy company stock on your behalf." Mr. Fritz made no reference to a stock purchase on behalf of Mr. Bavelis. In response, Mr. Doukas sent the following email:

Hi moyle I authorize you to transferred the all the monies today except on my personal account you hold it for· now so transferred everything else except the personal and next week I will wire more money try to sent me the wire instructions too thanks confirm you received that email thanks Ted

Debtor's Ex. 121 at GB 004014. Mr. Doukas was instructing Mr. Fritz not to transfer $199,275 from his personal account, so

that the amount of funds being transferred would be $1,464,725. Mr. Doukas raised no issue with the statements in Mr. Fritz's email to the effect that the funds were being transferred to Sterling Holding for the purpose of purchasing stock on behalf of Mr. Doukas. Tr. at 157:15–158:5. The $1,464,725 of funds were transferred to an account named "Sterling BancGroup, Inc." Debtor's Ex. 121 at GB 004015–GB 004021; Tr. at 159–61. This amount closely approximates the "not less that 10%" of the alleged Schedule A to the QC Loan Agreement. Although Mr. Doukas purchased the shares in September 2009, he requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's, at which time the certificates would be placed in the name of Mr. Doukas's trust. Tr. at 608. This request no doubt would have taken Mr. Bavelis by surprise in light of Mr. Doukas's representation of his extensive estate-planning experience—presumably gained from planning his own estate-prior to the execution of the QC Loan Agreements.

In order to explain the inconsistency between the foregoing and his argument that the funds were being provided for Mr. Bavelis's benefit, Mr. Doukas alleged the existence of a confidential agreement with Mr. Bavelis under which the transfer of the funds was to purchase stock on behalf of Mr. Bavelis. Tr. 60:24–61:19. Mr. Doukas did not produce the agreement before trial. During trial, he stated to Mr. Bavelis's attorney that "[y]ou can read the agreement. You will see it there. Confidentiality." Tr. at 61:16–17. The alleged agreement, however, was never produced. Other than Mr. Doukas's self-serving testimony, there is no evidence that such an agreement ever existed.

By contrast, Mr. Bavelis testified that there was no such agreement, Tr. at 604, and his testimony was supported by ac-

tions taken by himself and his family. Mr. Bavelis stated that if he or members of his family were going to purchase additional shares in Sterling Holding he would place the stock certificates in the name of the person who provided the funds for the purchase. Tr. at 605. And that is precisely what he and members of his family did. In September 2009, Mrs. Bavelis purchased shares in Sterling Holding on behalf of a trust, and one of the Bavelises' daughters purchased shares on her own behalf. Later that same year, in December, Mr. Bavelis purchased additional shares in Sterling Holding on behalf of the Trust. Tr. at 605–06; Debtor's Ex. 122.

Mr. Doukas himself purchased additional stock in Sterling Holding near the end of September 30, 2009. He signed a letter stating that the proceeds of a $500,000 loan from Sterling Bank (secured by an asset owned by Leftheris Properties Corp., Tr. at 862–63) should be transferred into "my Leftheris Properties Corp. account" and $7,000 from "my Leftheris Ted Doukas account ... to my Leftheris Properties Corp. account" and that "$500,000 of funds in my Leftheris Properties Corp. account [should be used] to purchase Sterling BancGroup stock." Debtor's Ex. 121 at GB 004033; Tr. at 105–08. The account statement that Sterling Bank sent Mr. Doukas for the period ending September 30, 2009 referenced the $500,000 amount and stated that it was to "PURCHASE 6250 SHARES SBG STK." Debtor's Ex. 121 at GB 004034; Tr. at 109; 202–03; 206; 862–63. In other words, Mr. Doukas obtained a loan from Sterling Bank for the purpose of purchasing stock in Sterling Holding. In November 2009, representatives of Sterling Bank came to believe that it was impermissible for the bank to make a loan for the purpose of purchasing stock in Sterling Holding and therefore rescinded the transaction, resulting in a repayment of the loan and reimbursement of interest and closing costs paid by Mr. Doukas. Tr. at 162–66; 210–13; 927–29; Debtor's Ex. 121 at GB 004003; GB 004035–36; Debtor's Ex. 124 at TD 000109.

On October 20, 2009 (before the September 30 stock purchase was rescinded), Mr. Doukas himself provided information to Mr. Bavelis that was to be included in a personal financial statement for Mr. Doukas. Tr. at 871. The second page of that financial statement stated that Mr. Doukas was the 100% owner of 25,759 Class A and B Sterling Holding shares. Debtor's Ex. 48 at GB 003913. That number of shares is equivalent to the sum of the shares Mr. Doukas purchased in March 2009 (1,200), on September 23, 2009 (18,309) and on September 30, 2009 (6,250).[11]

---

11. Mr. Doukas's personal financial statement is enlightening in at least one additional respect. In the financial statement, he listed the value of shares owned by Aries Capital in a company called Regulon at $6,250,000, Debtor's Ex. 48 at GB 003913, even though in the list of selected accomplishments he presented to Mr. Bavelis in April 2009 Mr. Doukas, in referring to the Regulon shares, represented that he was the "[o]wner of approximately $30,000,000 of private stock...." Debtor's Ex. 46 at GB 000791. Not only that, but when Mr. Bavelis's attorney pointed out that Aries Capital "is a company that every year reports to the IRS that [it] has less than $250,000 in value," Tr. at 132, Mr. Doukas first attempted to explain this by stating "[t]hat stock is not traded stock," Tr. at 132, and then backtracked by stating that what he actually owned were stock options. Tr. at 133. Changing his story yet again, he then stated that he owned stock and stock options in Regulon. Tr. at 134. The value of the stock and options was never established. Tr. at 872–75.

Mr. Doukas's conflicting statements concerning the nature and value of his Regulon stock holdings illustrate why the Court found his trial testimony to be so lacking in credibility. Over several days of cross-examination, Mr. Doukas exhibited a remarkable pattern of

For the foregoing reasons, the Court finds that the stock Mr. Doukas purchased in Sterling Holding in September 2009 was purchased on his own behalf, not on behalf of Mr. Bavelis.

### 5. The Colonial Bank and First Southern Loans Guaranteed by Mr. Bavelis

Mr. Doukas also testified that the consideration provided for the QC Note included the restructuring of the Colonial Bank and First Southern loans that Mr. Bavelis had guaranteed. Tr. at 285. No such restructuring ever occurred, and the responsibility for the failure lies with Mr. Doukas. On September 24, 2009, Mr. Doukas sent Mr. Bavelis a text message regarding Colonial Bank and the Lake Mary Project. Debtor's Ex. 67 at GB 004052. Mr. Bavelis explained the text as follows:

> [H]e was going to buy the bank notes so I would not have to have this pressure on me to make the payments. And that's what he was referring to, the Colonial Bank was taking over by BB & T and at that time I think it was in transition between BB & T and FDIC. We're not quite sure as to who the owner of the note is going to be. And in fact he told me he had a friend at FDIC and he was going to work with FDIC and this note from Colonial Bank will not go into BB & T. His friend will help him to keep it so he can buy it.

Tr. at 576:27–577:10. As Mr. Bavelis testified, this "[n]ever happened." Tr. at 577:12.[12]

Mrs. Bavelis confirmed that Mr. Doukas said he was working with someone at the FDIC to purchase the notes. Tr. at 405. In fact, Mr. Doukas staged a scene to make it appear that he was working on acquiring the notes. As Mrs. Bavelis testified:

> In my kitchen ... Ted Doukas he dialed a number and he had this guy on a speaker phone and he asked him, "What's happening with the notes?" And this guy, whoever the guy was said, "Oh, don't worry, by Thursday I'll have the notes." And that was going on for many, many months. But that night this man whoever the man was told Ted Doukas that the notes would be finalized by Thursday.

Tr. at 406:4–12.

They never were. Nor was a deal reached with First Southern. As Mr. Bavelis testified, the lack of success was a result of Mr. Doukas's failure to do what would have been required. Tr. at 627:15–24 ("[Mr. Doukas], apparently he was telling me that he was talking to the banks to buy the notes. And at some point I remember talking to Chuck whom I knew, he was executive vice president of First Southern Bank. And I asked him, 'Chuck, why does it take you so long for you to get this note sold to Ted Doukas?' He said, 'George, I asked him to send me financials

---

evasiveness. During his cross-examination, Mr. Doukas suffered one convenient memory lapse after another. Yet, when recounting facts that might support his version of events, his recollections were unclouded. Moreover, documents admitted into evidence that he prepared or that were prepared on his behalf—such as his tax returns and personal financial statement—were riddled with inconsistencies. In short, Mr. Doukas's trial testimony—as well as his out-of-court statements

that were admitted as evidence—had a chameleon-like quality, shifting as necessary to suit his purposes at a given time.

**12.** Branch Banking and Trust Company ("BB & T") acquired the assets of Colonial Bank from the FDIC as Receiver of Colonial Bank. BB & T filed a proof of claim against Mr. Bavelis in the liquidated amount of $13,375,450.12, plus unliquidated amounts. Case No. 10–58583, proof of claim number 9.

and other papers and he never did do anything, I didn't get anything, so I'm not working on it.' "). Mr. Doukas failed to provide financial statements and other documents because he had never had any prepared. Tr. at 68–69. Mr. Bavelis never received anything in writing showing that Mr. Doukas had reached an agreement with these lenders. Tr. at 627–28. In fact, Mr. Doukas conceded that no restructuring was ever accomplished and that a term sheet was never even signed. Tr. at 286–89.

### 6. The Request to Return the QC Loan Documents

Before Mr. Bavelis signed the QC Loan Documents in June 2009, Mr. Doukas told him that he would return the documents within three to four months. Tr. at 584:9–12. In late October 2009, after Mr. Doukas failed to return the QC Loan Documents in that time frame, Mr. Bavelis suggested that the poor relationship Mr. Doukas had with his daughters counseled in favor of returning them:

> I think it was close to the end of October when I specifically asked him, I said, in fact my wife was there at the time and I said, "Ted, you know, you're flying back and forth to New York and you're flying a lot all over the place, and God forbid if something happens to you what is going to happen to this note, this $14,000,000 note. I feel very uncomfortable because if your daughters get a hold of this note where would I be with the $14,000,000 note." He said, "Don't worry about it. I'll give it back to you. I'll give it back to you." That was his answer. And in fact the rest of the papers, every time I ask for, "I will give them back to you. I will give them back to you."

Tr. at 591:10–23. Mrs. Bavelis remembered the conversation the same way:

> [T]hey were in the living room talking and George told Ted, he said, "You know, Ted, I feel a little uneasy because you travel so much and you have this $14,000,000 note and you're telling me, you know, your children, your daughters are, you don't have relationship. If something happens to you how am I going to deal with the girls?" And he said, "Oh, okay, I'll just give it to you. Don't worry, I'll give it to you."

Tr. at 403:27–404:8. In other words, Mr. Bavelis realized that it would not be apparent to the beneficiaries of Mr. Doukas's estate that no payments were to be made under the QC Note. His request to return the QC Note—as well as Mr. Doukas's statement that he would do so—is consistent with Mr. Bavelis's testimony that no payments were expected under the QC Note and that the QC Loan Documents would be returned.

### 7. The Bavelis–Qureshi LLCs

At some point, Mr. Bavelis and Mr. Doukas discussed the possibility of Mr. Bavelis causing an assignment to be made of the 50% interests in the Bavelis–Qureshi LLCs (held by him, Bavelis Family and FLOHIO) to Mr. Doukas or one of his companies. Quick Capital Ex. T. Mr. Doukas testified that he made Mr. Bavelis aware of his desire to purchase those interests on his own behalf prior to the execution of the QC Loan Documents in June 2009, Tr. at 852, and that the agreement was that as part of the deal he or one of his companies would agree to provide Mr. Bavelis indemnification on account of Mr. Bavelis's guarantees of the bank debt of the Bavelis–Qureshi LLCs. Tr. at 290. To the contrary, the evidence suggests that the discussions, if any, that Mr. Bavelis and Mr. Doukas had regarding Mr. Doukas or one of his companies obtaining interests in the Bavelis–Qureshi LLCs on a permanent basis occurred in the fall of

2009. Quick Capital Ex. T. In fact, before Mr. Bavelis assigned 10% of his interest in GMAQ to Blair and his entire interest in GMAQ to R.P.M., Mr. Doukas promised Mr. Bavelis that the assignments would be returned once the negotiations with Mr. Qureshi were finalized, which apparently would have resulted in neither Mr. Doukas nor any entity affiliated with him permanently retaining any interest in the Bavelis–Qureshi LLCs.

The Court, however, need not decide whose recollection of the timing is accurate. Before the execution of the QC Loan Documents, Mr. Doukas promised that he would negotiate with Mr. Qureshi in such a manner that any resolution of the disputes with respect to the Bavelis–Qureshi LLCs would be in the best interests of Mr. Bavelis. As explained below, Mr. Doukas contends that Nemesis now owns the 50% interest in the Bavelis–Qureshi LLCs once owned by Mr. Bavelis, Bavelis Family and FLOHIO, without any indemnification being provided to Mr. Bavelis—a result that clearly is not in the best interests of Mr. Bavelis. In other words, whether the specific promise made by Mr. Doukas prior to the execution of the QC Loan Documents was the one described by Mr. Bavelis or the one set forth by Mr. Doukas, Mr. Doukas kept neither. In fact, Mr. Bavelis never received indemnification or anything else in exchange for the transfer of interests in the Bavelis–Qureshi LLCs (other than the $50,000 under the R.P.M. Agreement, which Mr. Bavelis repaid).

In addition to the false promises that Mr. Doukas made before the execution of the QC Loan Documents, a series of events that occurred in the fall and winter of 2009 led to this outcome. By the fall of 2009, Mr. Bavelis's FLOVEST problems included personal guarantee obligations in excess of $13.7 million ($3.7 million held by First Southern and approximately $10 million held by Colonial Bank), as well as a state court action by Colonial Bank seeking foreclosure and the appointment of a receiver with respect to the Lake Mary Project. Before the execution of the QC Loan Documents, Mr. Doukas had promised Mr. Bavelis that he would acquire this debt as well as work to resolve the issues with Mr. Qureshi in a manner consistent with the best interests of Mr. Bavelis. Even if Mr. Bavelis had desired to rely solely on Mr. Doukas to resolve those issues, Mr. Bavelis was not in a position to rely solely on Mr. Doukas when it came to FLOVEST. The equal members of FLOVEST were MAQ Management and FLOHIO. Thus, Mr. Bavelis's interest in FLOVEST was indirect—a 50% interest was held by FLOHIO, and a one-third membership interest in FLOHIO was held by Bavelis Family, in which Mr. Bavelis held an interest. The principals of the other members of FLOHIO were, of course, interested in resolving the FLOVEST issues, including the Colonial Bank foreclosure action.

In the summer and fall of 2009, Mr. Bavelis and Mr. Qureshi had a number of meetings to discuss FLOVEST and to address the possibility of one of them buying the other's interests in the Bavelis–Qureshi LLCs. Debtor's Ex. 173 at 123–25; Quick Capital Exs. M; T. The last of those meetings occurred sometime in the fall of 2009. Debtor's Ex. 173 at 123:3–9. On October 21, 2009, Mr. Bavelis sent a letter on behalf of FLOHIO to MAQ Management and Mr. Qureshi, Quick Capital Ex. M; Tr. at 609–10, offering to sell FLOHIO's 50% interest in FLOVEST to MAQ Management in exchange for $100,000 and a release of FLOHIO's and Mr. Bavelis's liabilities on the bank debt. Alternatively, FLOHIO would purchase MAQ Management's 50% interest in FLOVEST for $100,000. Mr. Bavelis was at that point

dissatisfied with Mr. Doukas's lack of success in reaching a deal with Mr. Qureshi. He explained the purpose of the letter as follows:

> [B]ecause of not being able to accomplish what Ted Doukas was promising me he would accomplish, my partners and I were getting so uneasy about it and we decided one way to split this partnership, this LLC, is to go ahead and make [Mr. Qureshi] an offer, either we buy him out or he buys us out. And this is what this is in reference to. My other two partners, The Vakaleris Family LLC and the Yessios Family LLC agreed for us to write this letter.

Tr. at 610:7–16. In response, on October 29, 2009, Mr. Qureshi (on behalf of MAQ Management) sent a letter to Mr. Bavelis purporting to accept FLOHIO's offer to sell its membership interest to MAQ Management for $100,000, provided that Mr. Bavelis's guarantees would remain in place. Quick Capital Ex. N; Tr. 610–11. That letter was followed by one from Mr. Bavelis to Mr. Qureshi on November 4, 2009 stating that the release of Mr. Bavelis's guarantee obligations was an "integral part of the offer," characterizing Mr. Qureshi's letter as a counteroffer and rejecting that counteroffer on behalf of FLOHIO. Quick Capital Ex. O. On November 12, 2009, Mr. Qureshi sent Mr. Bavelis a letter reiterating MAQ Management's position that it had properly accepted FLOHIO's original offer. Quick Capital Ex. P. Those letters did not result in a resolution, and the problems with FLOVEST continued.[13]

In November 2009, Mr. Bavelis's attorney, Mr. Schaeffer, sent a letter to Mr. Bavelis and certain principals of the other members of FLOHIO (i.e., Yessios Limited Partnership and Vakaleris Family Limited Partnership). Debtor's Ex. 127. In response to the letter from Mr. Schaeffer, one of those principals stated in an email: "I vote to proceed with the . . . dissolution [of FLOVEST], even though I have a strong suspicion that [Mr. Qureshi] will find a way to maneuver around this as well. I see this as a last resort and if it does not work the consequences should be obvious." Debtor's Ex. 127 at TD 000119. In response, Mr. Bavelis stated that he "would prefer to see what the possibility is of working out with the plaintiff's lawyer and possibly the judge before we jump into dissolution. I believe Mahammad is getting desperate more and more every day. I hope to hear something this coming week regarding the Notes." Debtor's Ex. 127 at TD 000118. In an email he sent to Mr. Bavelis and others with an interest in FLOHIO on November 30, 2009, Mr. Schaeffer recommended the filing of a dissolution complaint. Debtor's Ex. 127 at TD 000117. That same day, Mr. Bavelis forwarded Mr. Schaeffer's email to Mr. Doukas. Debtor's Ex. 127 at TD 000117.

Mr. Bavelis did not inform Mr. Schaeffer of what happened next until after the fact. The confidence Mr. Bavelis previously had in Mr. Doukas apparently was momentarily restored when, in December 2009, Mr. Doukas advised Mr. Bavelis that a deal had been struck with Mr. Qureshi. Mr. Doukas told Mr. Bavelis that, in order to finalize the deal, Mr. Doukas would need an assignment to be made to Nemes-

---

**13.** Mr. Qureshi's recollection of the sequence and timing of events is not entirely accurate. During his deposition, Mr. Qureshi recalled that Mr. Bavelis made the offer to sell 50% of the interests in the Bavelis–Qureshi LLCs for $100,000 (or, alternatively, to purchase the 50% interest held by Mr. Qureshi and his companies) after the December Agreements were executed. Debtor's Ex. 173 at 127:17–20. To the contrary, the October and November 2009 dates of the letters sent by Mr. Bavelis clearly show that he made the offer before he signed the December Agreements.

is of the 50% interests that Mr. Bavelis, Bavelis Family and FLOHIO owned in the Bavelis–Qureshi LLCs, but that the assignments would be returned after Mr. Doukas had acquired the 50% interest held by Mr. Qureshi. That is, as he had with the QC Loan Documents, Mr. Doukas told Mr. Bavelis that he would return the assignments after the deal with Mr. Qureshi was finalized.[14] Mrs. Bavelis confirmed that Mr. Doukas made such a representation to her husband:

> Q. Did you hear any discussions between your husband and Mr. Doukas about your husband assigning any interest in any of the Florida operating companies and I define those as BMAQ, GMAQ, Flovest or George Real Estate?
>
> A. Yes, I did.
>
> Q. And please explain to the Court—
>
> A. Yes.
>
> Q.—what you recall hearing in that regard.
>
> A. I did hear them discussing that and I heard Doukas telling George, "You know, you give me, you sign these documents I will negotiate with Mahammad and after everything is done I'll just give you back the papers. It's a matter of dealing with this man and after I do that I'll just return the papers back." As a matter of fact he used a term, a Greek term … which means it's just between us, I'll just give it back to you.
>
> . . . .

Q. And when you say he indicated he would return the paper, return the paper when?

A. After he had finished dealing with Mahammad Qureshi.

Tr. at 401:21–402:22. *See also* Tr. at 412; 428–32. Unbeknownst to Mr. Bavelis, however, in December 2009 Mr. Doukas was attempting to purchase on his own behalf the 50% interest in the Bavelis–Qureshi LLCs owned by Mr. Qureshi or his affiliated entities. Debtor's Ex. 173 at 18:21; 19:16.[15]

On the afternoon of December 16, 2009, Mr. Bavelis and Mr. Doukas met at a shopping center in Boca Raton. Mr. Bavelis describes the meeting as follows:

> So in fact we met around 5:30 I remember at Starbucks Café. And he said, "Once we sign this I'm going to straight to [Mr. Qureshi's] house and it's done. It's a done deal, George." He took this paper from the back of his pocket along with some other pieces of paper and I was so relieved, finally we got it, a resolution here.

Tr. at 569:21–27. *See also* Tr. at 615–17. And so, on December 16, 2009, Mr. Doukas handed Mr. Bavelis—and Mr. Bavelis signed—four agreements purporting to transfer membership interests in the Bavelis–Qureshi LLCs to Nemesis. In particular, Mr. Bavelis (on his own behalf and as a member of GMAQ) and Mr. Doukas (on behalf of Nemesis) signed an agreement entitled "GMAQ, LLC, Members, Transferor's and Transferee's Consent and

---

14. Each of the certificates of acknowledgment on the agreements Mr. Bavelis signed in December 2009 ("December Agreements") states that they were signed on January 20, 2010, but the parties agree that they were signed on December 16, 2009.

15. During the trial, Mr. Bavelis objected to the admission of this portion of Mr. Qureshi's deposition and others based on Mr. Qureshi's

refusal to comment on the financial terms of the alleged deal between Mr. Qureshi and Mr. Doukas. The assertion of confidentiality, however, was merely with respect to the financial terms of the deal, Debtor's Ex. 173 at 25:7–10; 29:21–25; 30:1–10, not to the existence of an offer or agreement between Mr. Qureshi and Mr. Doukas.

Approval of Transfer of Ownership" ("December GMAQ Agreement"). Debtor's Ex. 139. By the December GMAQ Agreement, Mr. Bavelis transferred to Nemesis all of his membership interest in GMAQ, even though he had already transferred 10% of that interest to Blair in March and 50% of that interest to R.P.M. in June 2009. Mr. Qureshi was named as a party on the first page of the December GMAQ Agreement, but he did not sign it—only Mr. Bavelis and Mr. Doukas signed. In light of the fact that GMAQ had no bank debt and owned approximately several million dollars in assets, Tr. at 767, 1004–06, Mr. Bavelis arguably had once again signed an agreement purporting to transfer his interest in the most valuable of the Bavelis–Qureshi LLCs.

At that same meeting, Mr. Bavelis (as the manager of Bavelis Family) and Mr. Doukas (on behalf of Nemesis) signed an agreement entitled "BMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December BMAQ Agreement"). Debtor's Ex. 140. By the December BMAQ Agreement, Mr. Bavelis purported to transfer to Nemesis all of Bavelis Family's right, title and interest in 100% of its membership interest in BMAQ. Qureshi Family was named as a party on the first page of the December BMAQ Agreement, but neither Mr. Qureshi nor anyone else signed the December BMAQ Agreement on behalf of Qureshi Family.

In addition, Mr. Bavelis and Mr. Doukas signed an agreement entitled "George Real Estate Holdings, LLC Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December George Real Estate Agreement") Debtor's Ex. 141. Under the December George Real Estate Agreement, Mr. Bavelis purported to transfer a membership interest in George Real Estate to Nemesis.

Mr. Qureshi was named as a party on the first page of the December George Real Estate Agreement, but he did not sign the agreement.

Finally, Mr. Bavelis (as the manager of FLOHIO) and Mr. Doukas (as the president of Nemesis) signed an agreement entitled "FLOVEST LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December FLOVEST Agreement"). Debtor's Ex. 142. By the December FLOVEST Agreement, Mr. Bavelis purported to transfer to Nemesis all of FLOHIO's right, title and interest in 100% of its membership interest in FLOVEST. The other member of FLOVEST—MAQ Management—was named on the first page of the December FLOVEST Agreement for the purpose of providing consent, but neither Mr. Qureshi nor anyone else signed the December FLOVEST Agreement on behalf of MAQ Management. Mr. Bavelis did not make Mr. Qureshi aware of the December Agreements, and Mr. Qureshi did not learn of them until some time later. Debtor's Ex. 173 at 57–58.

A few hours after Mr. Doukas left the shopping center in Boca Raton, he sent Mr. Bavelis a text message indicating that he was going to visit Mr. Qureshi to finalize the deal. Debtor's Ex. 67 at GB 004055. In another text message he sent that same night, Mr. Doukas told Mr. Bavelis: "I promise I will finish [Mr. Qureshi] and he will lose everything[.] I will be there all the time now and I will get the note from First Southern bank[.] I don't want Anything to happened to you[.] I an entering his house now . . . ." Debtor's Ex. 67 at GB 004055.

Mr. Doukas later returned to the Bavelises' home to obtain financial information regarding the Bavelis–Qureshi LLCs. As Mrs. Bavelis testified, "he came back to

our house and he asked George to give him all the financial information about all these companies he had with Qureshi." Tr. at 412:18–21. "And I remember [Mr. Bavelis] had a stack of papers that, you know, whatever he asked of George he would just give it to him." Tr. at 412:21–23. "So he took the papers and he said, "I struck a deal with Mahammad, this is it, we're finished. I'm going to take this to him so he can sign it and then I'll bring your papers and we're done." Tr. at 412:23–27.

Mr. Bavelis received no cash or any other remuneration in exchange for the December Agreements. "The only thing he wants is to be indemnified," Mr. Doukas testified. Tr. at 852:10. Yet neither Mr. Doukas nor any of his companies ever provided Mr. Bavelis any effective indemnification for his potential liability arising from his guarantees of the debts of the Bavelis–Qureshi LLCs. GMAQ had no bank debt, so Mr. Bavelis had no exposure on any guarantee of such debt with respect to GMAQ. It is convenient for Mr. Doukas, therefore, that the only agreement that arguably provided Mr. Bavelis any indemnification on account of his guarantees appears in the December GMAQ Agreement, which states that Nemesis "agrees to indemnify George A. Bavelis and hold him harmless with respect to any and all claims incurred as a result of his being a member of GMAQ, LLC." GMAQ Agreement at 2. *See also* Tr. at 1006.

With respect to those Bavelis–Qureshi LLCs that actually had bank debt guaranteed by Mr. Bavelis—BMAQ and FLOVEST—the indemnification language is either much more limited or nonexistent. The December BMAQ Agreement states: "Nemesis agrees to indemnify and hold harmless Bavelis Family LLC from all liabilities arising out of this Agreement." December BMAQ Agreement at 2. That language provides absolutely no indemnification to Mr. Bavelis personally, and the indemnification it does provide is only for those liabilities arising out of the December BMAQ Agreement, which clearly would not include liability on Mr. Bavelis's guarantees of BMAQ's debt. Tr. at 1007–08. Mr. Bavelis also was a guarantor of the substantial debt of FLOVEST, yet the December FLOVEST Agreement included no indemnification provision at all. Tr. at 1009; Debtor's Ex. 142. In sum, neither Mr. Doukas nor any of his companies provided Mr. Bavelis indemnification or any other value in exchange for the transfer of the membership interests in the Bavelis–Qureshi LLCs.

### 8. Sterling Bank's Nonperforming Loans

Mr. Doukas also testified that the consideration under the QC Loan Agreement included making all his assets available to secure financing so that he could purchase nonperforming loans of Sterling Bank. Tr. at 926. The idea, according to Mr. Doukas, was "to make [Sterling Bank's] nonperforming notes performing because they would get my loans and I would get theirs." Tr. at 933:18–20. *See also* Tr. at 934:12–19 ("[I] [w]ould take the performing notes that I had, the mortgages, the 6.7, the $3,000,000, there was another note then, I don't remember what it was, and give it to them, sign it to them, and give me non-performing loans. So that would make the bank to have performing loans with income and I would get the non-performing loans. And that was one of the situations that we were dealing with . . . Mr. Albright."). Or, as Mr. Fritz put it, Mr. Doukas "was suggesting that we take [the loans on which his companies were the payees] as collateral to allow him to [obtain] a loan from [Sterling Bank] and he would use the monies from that loan to turn around and buy [Sterling Bank's] non-performing assets." Tr. at 190:12–16.

On January 13, 2010, Mr. Doukas presented a proposal to Mr. Bavelis and Mr. Albright and other members of Sterling Bank's senior management team regarding Mr. Doukas's acquisition of certain of Sterling Bank's nonperforming loans. Debtor's Ex. 47. The next day, Mr. Albright sent Mr. Doukas an email stating that "[a]fter discussing the proposal you presented to George and me yesterday with my Senior Management Team it seems your request has merit as long as each transaction can be underwritten and the Sponsors can demonstrate the capacity to repay the debt service as determined by us." Debtor's Ex. 47. According to Mr. Albright, Sterling Bank "must be able to properly document the source of funds that will be available to meet all the terms and conditions of our loans" and "complete financial information on all our sponsors (tax returns, current personal financial statements, current liquidity statements, etc.) in order to determine whether or not we can proceed." Debtor's Ex. 47; Quick Capital Ex. WW. As it turns out, there was insufficient value in the assets Mr. Doukas was proposing to use to purchase the loans. Tr. at 168–69; 216. Mr. Doukas conceded that he never acquired any of Sterling Bank's nonperforming loans. Tr. at 290:7–10.[16]

### 9. Mr. Doukas's Assets

In fact, none of the assets owned by Mr. Doukas or his companies were ever effectively used by either Mr. Bavelis or Mr. Doukas on Mr. Bavelis's behalf. Mr. Bavelis himself could not have used them because, as Mr. Bavelis testified, "there was no way [he] ... personally ... would ... be able to borrow any more money." Tr. at 635:27–636:2. Even if Mr. Bavelis had been able to obtain a loan in order to restructure his finances, he could not have done so based on the assets purportedly made available by Mr. Doukas under the QC Loan Agreement. In this regard, Mr. Bavelis called Alan Parkinson as an expert witness "with respect to the credit process[,] ... the advancement of money based upon assets being pledged, as well as the process that's undertaken as part of the underwriting process to evaluate whether to extend credit." Tr. at 799:18–23. Mr. Doukas did not object to Mr. Parkinson testifying as an expert witness on those matters, Tr. at 803:1–4, and the Court found Mr. Parkinson to be a well-qualified and credible expert witness.

Mr. Parkinson testified that no reasonable lender would have lent money to Mr. Bavelis based on the assets purportedly being made available by Mr. Doukas under the QC Loan Agreement. The reasons no lender would do so, Mr. Parkinson testified, included Mr. Doukas's failure to provide sufficient financial information about the value of the assets purportedly being made available to Mr. Bavelis and the nominal value of the assets as reflected on income tax returns of Louden, Raelaur, Lisa Court and Aries Capital. Tr. at 807:6–11; 810:23–811:17; 815:2–816:8; 819:8–24; 823:3–18; 831:20–832:4. Based on Mr. Parkinson's testimony, the Court finds that no reasonable lender would have lent funds to Mr. Bavelis in exchange for a security interest in the assets made available under the QC Loan Agreement.

---

**16.** As discussed above, Mr. Doukas contends that Blair became obligated on the debt owed by Glenn Wright Co. Even if true, this occurred before the QC Note was executed, and Mr. Bavelis was unaware of Blair's becoming obligated on the debt. Tr. at 660:9–24. In addition, although an asset owned by Lefther-is Properties Corp. eventually was used by Mr. Doukas as collateral for a loan by Sterling Bank to purchase stock in Sterling Holding, it was so used on behalf of Mr. Doukas (not Mr. Bavelis), and that transaction was later unwound. Tr. at 862–63.

Because he could not borrow any more funds, Mr. Bavelis believed that Mr. Doukas would work to obtain a loan secured by the assets on Mr. Bavelis's behalf. Tr. at 636:3–7. Likewise, Mr. Doukas suggested that it was he or his companies that would pledge the assets and obtain loans for Mr. Bavelis. Tr. at 129–30. Yet no assets owned by Mr. Doukas or his companies were used by Mr. Doukas to assist Mr. Bavelis's restructuring efforts. Tr. at 126–27; 599; 863–69. And the evidence shows that the assets purportedly being made available by Mr. Doukas would not have supported an asset-based loan of sufficient size to allow Mr. Doukas to purchase the nonperforming loans of Sterling Bank or the loans guaranteed by Mr. Bavelis. Again, the companies mentioned in the QC Loan Agreement were Louden, Raelaur, Lisa Court and Aries Capital. Mr. Doukas testified that Louden owned a small office building and received income from a lease on land in Amityville, New York, Tr. at 880–82; that Lisa Court owned a gasoline storage terminal in Meridian, Mississippi that needed work to address environmental issues and issues relating to the condition of the tanks. Tr. at 878; and that Aries Capital owned stock and stock options in Regulon, the value of which he never established. Tr. at 872–75. Raelaur apparently owned Mr. Doukas's residence in Syosset, New York. Tr. at 542. On federal income tax returns filed for the tax year 2009, Louden, Lisa Court and Raelaur reported the value of their total assets as $0, Debtor's Ex. 192, 196 & 209, and Aries Capital reported its total assets as $2,500.

The other entities for which Mr. Doukas produced 2009 income tax returns reported total assets of $0 (Nemesis and R.P.M.), Debtor's Exs. 186 & 188, and $6,788,298 (WKYA). Debtor's Ex. 218. The asset reported by WKYA was a promissory note it held secured by real estate in New York.

Tr. at 98–99; 101; 864–65. Despite monthly payments under the note of approximately $30,000, Tr. at 99; 865, WKYA reported only $24,130 of taxable annual income after deducting compensation to officers and other cash expenses. Debtor's Ex. 218. In connection with a potential refinancing of his debt to Fifth Third, Mr. Bavelis sent a copy of the WKYA note to a representative of Merrill Lynch. Debtor's Ex. 82 at TD 000015. The Merrill Lynch representative was interested in advancing funds for the refinancing based on securities owned by Mr. Bavelis, but was uninterested in the WKYA note. Tr. at 601. Based on all the evidence, the Court finds that Mr. Doukas knew that the assets he purportedly was making available would not support his purchase of the nonperforming Sterling Bank loans or the bank loans guaranteed by Mr. Bavelis. Furthermore, by Mr. Doukas's own admission, none of his companies had prepared any sort of financial statements, Tr. at 68–69, which would have made it unlikely that he could have obtained a loan using those assets. Tr. at 815, 819.

Mr. Doukas conceded that he never lost ownership of any of his assets as a result of purportedly making them available to Mr. Bavelis. Tr. at 126–27. Although Mr. Doukas testified that he lost opportunities to use the assets for his own purposes as a result of his purported agreement to pledge his assets on behalf of Mr. Bavelis, Tr. at 127; 262–69, he provided no evidence to back up his claim, and the Court therefore finds that he lost no such opportunities.

### 10. Consulting and Management Services/Estate Planning

The QC Loan Agreement stated that "Quick has provided and will continue to provide consulting and management ser-

vices in an effort to restructure various liabilities and troubled assets owned directly or indirectly by GAB" and provided for entry into the QC Security Agreement "as security for the payment of these services rendered and to be rendered...." Debtor's Ex. 76 at GB 004059. As discussed above, Mr. Doukas testified that the consulting and management services to be provided were to restructure the Colonial Bank and First Southern loans, to acquire nonperforming loans from Sterling Bank and to resolve the issues with Mr. Qureshi and indemnify Mr. Bavelis. As the evidence already set forth demonstrates, Mr. Doukas never performed any of those services, either before or after the execution of the QC Loan Documents.

Mr. Doukas also never helped finalize Mr. Bavelis's estate planning. And there is evidence that Mr. Doukas never intended to do so. His lack of intent in this regard is evidenced by his lack of estate-planning experience. The evidence for Mr. Doukas's lack of experience in estate planning includes the fact that, whenever Mr. Bavelis would inquire regarding the manner in which Mr. Doukas wished to take title to the shares of stock he purchased in Sterling Holding in September 2009, Mr. Doukas would request that the issuance of the certificates for the shares be deferred until after Mr. Doukas formed a trust similar to Mr. Bavelis's. Tr. at 608; 746–47. Mr. Doukas's extensive estate-planning experience presumably would have included involvement in preparing his own trust. Yet when Mr. Doukas made the promise in June 2009 that he would help finalize Mr. Bavelis's estate planning, Mr. Doukas had not even done such estate planning for himself. Moreover, there is no evidence that Mr. Doukas had performed estate-planning services for anyone else. Thus, at the time Mr. Doukas made the representations to Mr. Doukas regarding estate planning—representations that induced Mr. Bavelis to sign the Quick Capital Loan Documents—Mr. Doukas knew that the representations were false and that he would not be assisting Mr. Bavelis with estate planning.

### 11. The Fallout

On January 25, 2010, Mr. Doukas sent a text message to Mr. Bavelis again indicating that he was close to resolving the disputes with Mr. Qureshi, Debtor's Ex. 67 at GB 004058, but he still did not return the December Agreements. Acting on the advice of Mr. Schaeffer (who was unaware of the December Agreements, Tr. at 618–19), Mr. Bavelis had, on December 18, 2009, signed a verified complaint for dissolution of FLOVEST in which he stated that FLOHIO was a 50% owner of FLOVEST even though he had signed the FLOVEST Agreement, purporting to transfer FLOHIO's interest in FLOVEST to Nemesis. Doc. 46 Ex. 2. The complaint, as well as a motion to appoint a receiver, were filed in a Florida state court on behalf of FLOHIO on December 21, 2009. Debtor's Ex. 144. Afterward, Mr. Schaeffer, as well as Mr. Bavelis's Florida litigation attorney, learned about the December FLOVEST Agreement and raised a concern about the representation Mr. Bavelis had made in the verified complaint regarding the ownership of FLOVEST. As a result, Mr. Bavelis "was desperate to get [Mr. Doukas] ... to give me these papers because Michael Schaeffer was coming Sunday [and] my local attorney said, 'George, I've prepared a document for you and you signed it and you didn't tell me about these papers.'" Tr. at 630:3–9. "Which is true, I didn't because I never thought of them being anything, [Mr. Doukas] was going to give them right back to me. And on that basis we were trying to appoint a receiver to try to finalize some-

thing with Flovest because we were getting nowhere." Tr. at 630:9–14.

In hindsight, Mr. Bavelis no doubt would agree that he should have done things differently. A businessman of his experience and stature clearly should not have turned to Mr. Doukas—or relied on his machinations—to resolve his financial difficulties, including his disputes with Mr. Qureshi. Mr. Bavelis also should have been more forthright with his attorneys and Mr. Qureshi regarding the existence and nature of the December Agreements, as well as the prior agreements transferring his interest in GMAQ. Based on Mr. Doukas's previous failures to deliver on his promises to return the QC Loan Documents, Mr. Bavelis should have suspected that the December FLOVEST Agreement might not be promptly returned. Accordingly, making a statement in the verified complaint filed in the Florida state court action regarding the ownership of FLOVEST that might be construed as strictly true only if and when the December FLOVEST Agreement was returned was certainly ill advised. Mr. Doukas uses this as a basis to attack Mr. Bavelis's credibility. Doukas Findings & Conclusions ¶¶ 2–5. Nonetheless, in light of the entirety of the evidence presented, the Court finds Mr. Bavelis to be a much more credible witness than Mr. Doukas.[17] Indeed, as previously stated, *see* n. 11, *supra*, based on his evasiveness on cross-examination and the many inconsistencies in his testimony, the Court finds Mr. Doukas to be an utterly unreliable witness.

In late January 2010, the die was cast, and Mr. Bavelis made desperate—and ultimately futile—attempts to convince Mr. Doukas to return the December Agreements. On January 29, 2010, Mr. Bavelis called Mr. Doukas in an attempt to persuade him to deliver the documents:

I will never forget those days by the way, the 29 of January that I knew that I had to get those papers back. And I called him Friday afternoon around 4:30 and I said, "Ted, I need those papers back please." Well, maybe I called him a little bit earlier and he called me back around 4:30. And he said, "George, I'm with the—I was all day with other people." Meaning the FBI. "And I have to go back within about an hour." And I said, "Ted, fine I can come. Where are you? I can come and pick up those papers." He said, "George, no, no, no, George. I have to go real quick, I have to eat something and go back to the FBI." And he said, "I will bring those papers back to you at 1:00 tomorrow, Saturday at your house." So I waited 1:00, I waited 2:00, I waited almost 3:00, no papers. I called him, left him messages, no answers, to call me back, there were no answers. Then I was so, so upset my wife started crying and say, "What has this man done to us?" And I said, "Gia, I know now what I didn't know before and I'm ashamed of myself not being able to recognize this individual, what kind of a con artist he is." In fact, if I remember correctly I told my wife, "He's a criminal." I told her just

**17.** Earlier in the Chapter 11 case, Quick Capital filed a motion requesting the appointment of a Chapter 11 trustee (Case No. 10–58583, Doc. 280), as did First Southern (Case No. 10–58583, Doc. 326). The FDIC, as Receiver of Sterling Bank, filed a joinder to Quick Capital's motion (Doc. 317), but later withdrew it. *See* Doc. 341. The evidence presented during the trial would not come even remotely close to constituting cause to grant a request for the appointment of a trustee under § 1104 of the Bankruptcy Code. Accordingly, unless a party in interest has evidence in addition to that presented by Quick Capital and Mr. Doukas during the trial, its request for the appointment of a trustee would be denied.

like that. And I just was losing it. My wife was so upset and started crying.... And we have heard nothing from this guy. Nothing. I knew I wanted to get those papers back because Michael Schaeffer was coming that weekend on Sunday and we had a meeting at 9:00 with Gary O'Donnell at his office and I had no papers. Of course I had explained to Michael what those papers were and what was happening and I have no papers back from him. And I knew then that I'm in trouble with this guy. I am not, he's not the guy that he presented me that he is. He is a con artist, nothing else.... And again I've very embarrassed to sit here today that say that I didn't recognize what kind of a person I was dealing with him for so long. I've been in business for 40 years and I think I had a pretty good sense of getting a message of whom I'm dealing with but I didn't, this guy mislead me. He's professional in his field.

Tr. at 760:1–762:7. As this testimony shows, Mr. Bavelis realized on January 29, 2010 that he should have heeded the occasional discomfort and dissatisfaction he felt with respect to Mr. Doukas based on events occurring (or failing to occur) after the execution of the QC Loan Documents. *See also* Tr. at 620:11–13 ("And I asked him to call me, he wouldn't call me. And at that time I got the message that I'm dealing with some con artist here.").

Mr. Bavelis then pleaded with Mr. Doukas in a voice message he left on the afternoon of January 30, 2010, a portion of which is reproduced below:

Yes, Leftheri, please call me. If you don't have the time to come I will be more than happy to come and pick up those papers because Michael is coming and I am paying two days of lawyers from Columbus to come in because (phone rings over voice) call me because it is extremely important because he still feels, I talked to him again today, and yesterday, again signed documents (starts speaking Greek) there are chances that they might put me into jail because I signed the papers for the affidavit and then signed papers also to you which are lies, he says to me that I'm going to lose, I'm going to lose everything. I'm not going to have any credibility neither and now they are going to take me to the courts and they will not take any notice to what I say or not say. I have to take the papers. I have to have the papers, [it's] imperative I have the paperwork because I have said to you he is coming tomorrow afternoon so we can have a meeting 9am on Monday and I must have those papers because they are going to come with the other attorney who wants to quit.... [S]o please call me because I've been very very upset and I really need your help, I don't know what else to do and I don't have anyone else to help me. Tell me where it is, give me your address and I will come and get them, I am pleading with you call me, ok.

Debtor's Ex. 151. *See also* Tr. at 630–31.

Mrs. Bavelis then offered to try to reach Mr. Doukas. "George, I will call him too because maybe he will listen to me," she told her husband. Tr. at 761. That same day, Mrs. Bavelis left the following voice mail for Mr. Doukas:

Yes, Leftheris, Michael [Schaeffer] just called me and I call him because he is coming tomorrow, and yesterday George told him that you were planning to come here to give him those papers and I had a long conversation, Leftheri, and he told me that this is fraud and maybe George will go to jail. Leftheri I know we are inconveniencing you a lot, please bring those papers and come over so you

can tell us what to do because he is going to come tomorrow and George is a mess and I do not know what to do he doesn't deserve, at this age, to go through hell, please Leftheri let us do something because he is coming tomorrow and we have to have something in our hands so the story is going to be over, please, please, Leftheri, please call me, bye bye.

Debtor's Ex. 152. During her testimony, Mrs. Bavelis conceded that she had not spoken to Mr. Schaeffer about the matter and that she "just told [Mr. Doukas these things] to convince him because I just could not comprehend that a human being would do this to someone, to make friends, to lie to them while they took him into their house for months and months and to do this to us, I could not believe it." Tr. at 435:3–7. Based on her demeanor and testimony, the Court found Mrs. Bavelis to be a credible witness, and the fact that she made a misrepresentation in a voice mail left for Mr. Doukas after she realized his perfidy does not change the Court's view that she is a fundamentally honest person who was distraught at being duped by someone she had trusted completely.

On February 1, 2010, Mr. Doukas stated in a text message to Mr. Bavelis that he could not talk. Although Mr. Doukas purchased the shares in Sterling Holding in September 2009, he repeatedly requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's. Tr. at 608; 746. Mr. Doukas's delay tactics made Mr. Bavelis "a little bit uneasy," Tr. at 608:15, but after the events of late January 2010, Mr. Bavelis decided he could wait no longer. Tr. at 750. "I told Linda Eppenga, 'Go ahead and send the certificate in his name and

when he gets the trust ready then I will go ahead and change the certificates. I'll issue new certificates and get the old ones back.' " Tr. at 608:15–20.[18] See also Tr. at 746–48.

On or about February 4, 2010, Mr. Bavelis sent Mr. Doukas a transmittal letter dated September 23, 2009 enclosing a stock certificate—also dated September 23—for 18,309 Class B shares in Sterling BancGroup, Inc. Quick Capital Ex. KK at GB 004008–12; Tr. at 748. The date was consistent with the correspondence of that same date indicating that Mr. Doukas was purchasing shares in Sterling Holding. The date of the letter and the certificate was appropriate. According to Ms. Eppenga, the dates placed on transmittal letters, as well as the certificates themselves, were the date the funds for the shares had been received. Debtor's Ex. 174 at 14; 24–25. In the instance of Mr. Doukas's stock, that date was September 23, 2009.

Mr. Doukas received the transmittal letter and stock certificate on February 8, 2010. Quick Capital Ex. KK at GB 004011. A week later, on February 15, 2010, Mr. Doukas sent the following letter to Mr. Bavelis:

Dear Mr. Bavelis:

I am in receipt of your certified letter dated September 23, 2009 via certified mail which was *actually mailed* on February 4, 2010 and received on February 8, 2010. Enclosed was a Stock Certificate from Sterling Bank Group purporting to convey to me 18,-309 shares of class B stock.

This is NOT my stock, I never requested any stock nor would I ever accept any stock from Sterling Bank Group. I sent you $1.7M which was

---

**18.** Ms. Eppenga was the controller of Sterling Bank and assistant corporate secretary who in the years 2009 and 2010 also had responsibility for the issuance of certificates of stock in Sterling Holding. Debtors's Ex. 174 at 11.

part of the consideration for a Promissory Note dated June 21, 2009. As far as I am concerned this stock has absolutely no value. I have no interest in it whatever. You can't simply give me stock of your choosing and claim that it is in exchange for money which I loaned you. There are many formalities which must be complied with in issuing stock. Foremost I must want this stock.

I was lending you money so that you could show the regulators additional capital which was required. I only loaned this based upon the various agreements between Quick Capital and yourself, which protects my interests. This stock offers me absolutely no protection and I have no interest in it. The FDIC and various bank regulators have very clear conditions related to the sale of stock. Trying to give me this stock in exchange for the money that was tendered is an outrage. It was never given to purchase stock. I demand that you set the record straight immediately. Tell me where this stock should be returned to.

Quick Capital Ex. JJ.

There are inconsistencies between this letter and the facts. Mr. Doukas states he "never requested any stock nor would I ever accept any stock from Sterling Bank Group," and yet he did so in March 2009 and did so twice again in September 2009. Mr. Doukas states that he was lending Mr. Bavelis money, yet funds were transferred from his accounts to a Sterling Holding account, not to an account maintained in the name of Mr. Bavelis. On April 9, 2010, Mr. Doukas filed a complaint with Federal Reserve. That letter contains inconsistencies similar to those contained in the letter to Mr. Bavelis. Debtor's Ex. 121 at GB 004006. On May 27, 2010, Mr. Albright sent a letter to the Federal Reserve responding to the complaint filed by Mr. Doukas. Debtor's Ex. 121 at GB 004002.

The last time that Mr. Bavelis heard from Mr. Doukas was in a text message on February 22, 2010 stating: "Let's sit down and settle our differences I don't think you want me to loose my money." Debtor's Ex. 67 at GB 004058. *See also* Tr. at 907–08. Mr. Bavelis did not respond to that final text. Tr. at 908.

On June 10, 2010, the Board of Governors of the Federal Reserve System ("Board of Governors"), determined that, as of April 30, 2010, Sterling Bank was "significantly undercapitalized" and issued a prompt corrective action directive providing the bank 30 days from date of directive to become adequately capitalized. Quick Capital Ex. CCC. Sterling Bank could not do so, and, in July 2010, Sterling Bank was taken over by the FDIC. Tr. at 176; 456–57.

**D. The Chapter 11 Case and the Adversary Proceeding**

On July 20, 2010, Mr. Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Mr. Bavelis then commenced this adversary proceeding by filing a complaint ("Complaint") (Doc. 1) against several defendants, including Mr. Doukas, Nemesis, Quick Capital and R.P.M.[19] After Mr. Bavelis commenced the adversary proceeding, Quick Capital filed the Original Proof of Claim in the

---

19. There are other defendants, including Mr. Qureshi and MAQ Management. Both Mr. Qureshi and MAQ Management commenced Chapter 11 cases in the Southern District of Florida in July 2011, *see* Notice of Filing of Bankruptcy of Defendants Mahammad Qureshi and MAQ Management and Suggestion of Stay, Doc. 128, thereby staying the adversary proceeding against them pursuant to 11 U.S.C. § 362(a).

amount of $1,667,791.10 for "Money Loaned." ($200,000 plus $1,467,791.10) and later filed the Amended Proof of Claim in the amount of $14 million plus interest. Neither Mr. Doukas nor any of his companies other than Quick Capital filed a proof of claim against the Debtor's estate.

In Count Three of the Complaint, Mr. Bavelis requests, among other things, a declaratory judgment that the QC Note fails for lack of consideration, has been fully satisfied, is void and should be rescinded based on fraudulent inducement. The affirmative defenses asserted by the Debtor thus constitute objections to the Proof of Claim pursuant to § 502(b) of the Bankruptcy Code ("Proof of Claim Objections"). *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 847, 852 (Bankr. S.D.Ohio 2011).

After Mr. Bavelis filed a motion to bifurcate the adversary proceeding for hearing (Doc. 137), the Court entered an order (Doc. 153) bifurcating Count Three of the Complaint. Quick Capital filed a motion for summary judgment (Doc. 170) on Count Three (as well as other counts) of the Complaint. The Court entered an order (Doc. 190) deferring a ruling on the motion with respect to matters other than the Proof of Claim Objections and denying the motion with respect to the Proof of Claim Objections based on the existence of genuine disputes as to material facts.

The trial on the Proof of Claim Objections lasted four days. Following the trial, the parties submitted, and the Court entered, the Agreed Order, which governed,

among other matters, the admission of exhibits.[20] The parties then submitted the Doukas Findings & Conclusions and the Bavelis Findings & Conclusions.

## IV. Legal Analysis

### A. Overview

 Under Federal Rule of Bankruptcy Procedure 3001(f), "[a] proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim." *In re Tudor*, 342 B.R. 540, 550 (Bankr. S.D.Ohio 2005). "A debtor has the initial burden of making a colorable challenge to a properly filed proof of claim." *Id.* In general, "[o]nce the debtor has met this burden, the burden of going forward shifts to the creditor, and the creditor bears the ultimate burden of persuasion." *Id.* However, "the burden of proof is an essential element of the claim itself" [and] "one who asserts a claim is entitled to the burden of proof that normally comes with it." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). Thus, if a debtor's objection to a claim is based on an affirmative defense for which the debtor would have the burden of proof outside of bankruptcy, the debtor must carry that same burden of proof in prosecuting the objection. *See In re Ousley*, 92 B.R. 278, 282–83 (Bankr.S.D.Ohio 1988) ("[T]he [debtors'] defense of duress is an affirmative one which must be established by the party asserting it.").

---

**20.** After the close of evidence, the parties were uncertain whether Quick Capital's Exhibits J and SS had been used during the trial. Tr. at 1110–12. Pursuant to the Agreed Order, the parties stipulated that the Court would reserve a ruling regarding the admissibility of those exhibits until after the Court reviewed the trial transcript to determine whether the exhibits "were actually used as part of the hearing." Agreed Order ¶ 8. After searching the transcript, the Court has not found that those exhibits were actually used during the trial. In any event, the Court has reviewed Quick Capital's Exhibits J and SS and has determined that there is nothing in those documents that would alter the Court's findings of fact or conclusions of law.

■ It is undisputed that Mr. Bavelis signed the QC Note and that he did not pay Quick Capital $14 million. Mr. Bavelis, therefore, has the burden of proof with respect to the affirmative defenses that form the basis for his objection to the Proofs of Claim. *See McCabe v. Green,* 2013 WL 173221, at *3–4 (N.Y.Sup. Jan. 16, 2013) ("Plaintiff sufficiently establishes a *prima facie* case that the four notes were signed by defendant, and constitute written instruments by which the defendant explicitly obligated himself to make a required payment of a sum certain.... Here, the allegation that defendant failed to pay the sums due under the notes is established, and undisputed.... Instead, defendant presents two defenses to non-payment: fraudulent inducement and lack of consideration...."); *Schlup v. Intermark Int'l Inc.,* 1989 WL 35127, at *2 (Ohio Ct.App. Apr. 12, 1989) (holding that "a signed promissory note constitutes *prima facie* evidence of the amount due" and that it is the issuer who must carry the burden of proof with respect to the affirmative defenses).[21]

In addition to relying on an argument that there was no manifestation of mutual assent or consideration supporting the QC Loan Documents—an argument the Court rejects—Mr. Bavelis also relies on the affirmative defenses of payment, failure of consideration and fraudulent inducement. The Court concludes that each of those affirmative defenses applies here, making the QC Loan Documents unenforceable against Mr. Bavelis. Under § 502(b) of the Bankruptcy Code, if a party in interest objects to a proof of claim, the Court "shall allow such claim ... except to the extent that[,]" among other things, "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" 11 U.S.C. § 502(b)(1). Because Quick Capital's claim is unenforceable against Mr. Bavelis, the Proofs of Claim must be disallowed in their entirety. Neither Mr. Doukas nor any of his companies has an enforceable claim against Mr. Bavelis or his bankruptcy estate.

**B. Mutual Assent/Consideration**

■ The formation of a contract requires a manifestation of mutual assent and consideration. *See Conception Bay, Inc. v. Koenig Iron Works, Inc.,* 2010 WL 2217799, at *3 (N.Y.Sup.Ct. May 28, 2010); *Jenkins v. Huebner,* 2002 WL 255124, at *1 (Ohio Ct.App. Feb. 22, 2002). The

---

**21.** Where, as here, the Bankruptcy Code "does not specifically address an issue that arises in bankruptcy, the bankruptcy court looks to state law, to the extent that it does not conflict with the [B]ankruptcy [C]ode [.]" *Reinhardt v. Vanderbilt Mortg. & Fin., Inc. (In re Reinhardt),* 563 F.3d 558, 563 (6th Cir. 2009) (internal quotation marks omitted). In reaching its conclusions of law, the Court relies on the law of the state identified in the governing law provision of the QC Loan Agreement (New York). Because the QC Note and the QC Loan Agreement do not refer to one another, the Court also relies on the law of the state in which Mr. Bavelis signed the QC Note (Ohio). The parties rely on the law of both states, and, although there are slight variations in New York and Ohio law bearing on the issues before the Court, the result is the same under the laws of both states, so the Court need not decide which state's law applies. *See Orix Credit Alliance v. CIT Grp./Equip. Fin., Inc. (In re Hughes),* 230 B.R. 213, 226 (Bankr.M.D.Ga.1998) ("Defendants argue that the contracts were entered into in Georgia. Moreover, Defendants assert that because the promissory notes do not contain a choice of law provision, the parties have not intended for the law of another forum, that is New York, to apply and therefore Georgia law would apply by default. However, ... the same result is achieved by applying either state's law. Accordingly, it is unnecessary for the court to determine which state's law applies.").

Court concludes that, Mr. Bavelis's arguments to the contrary notwithstanding, *see* Bavelis Findings & Conclusions at 102–06, the parties' agreement lacked neither a manifestation of mutual assent nor consideration.[22]

## 1. Manifestation of Mutual Assent

"Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance." *McSweeney v. Jackson,* 117 Ohio App.3d 623, 691 N.E.2d 303, 308 (1996). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act." *Id.See also Conception Bay,* 2010 WL 2217799, at *3 ("Assent may be implied when a party has conducted himself in such a manner that his assent may fairly be inferred." (internal quotation marks omitted)). Here, both parties not only made mutual promises, they conducted themselves in a manner that gives rise to an inference of assent.

The promises set forth in the QC Loan Documents included Quick Capital's agreement to lend $200,000 to Mr. Bavelis. There was no evidence establishing that Mr. Bavelis and Mr. Doukas (on behalf of Quick Capital) agreed that $200,000 would not be advanced. While there is no provision in the QC Loan Agreement expressly requiring Mr. Bavelis to repay the $200,000, there also was no evidence presented suggesting that Mr. Bavelis would not be required to repay any amount actually advanced, and the Court concludes that there was an implied promise on his part to repay the $200,000 loan. *See Donovan v. Burkowski,* 51 A.D.2d 878, 380 N.Y.S.2d 134, 136 (1976) ("[A]lthough the circumstances under which the money was given were somewhat equivocal and no notes or formal promises to pay were made by respondent, the trial court correctly found that these transactions constituted loans and that there was an implied promise to repay."). *See also Beverly v. Davis,* 79 Wash. 537, 140 P. 696, 698 (1914) ("If the circumstances show a loan, an implied promise to repay springs from that fact alone.").

Moreover, Mr. Bavelis and Quick Capital agreed to enter into the QC Security Agreement, which provided security for Mr. Bavelis's obligation to repay the $200,000 loan. The parties' subsequent conduct confirms their mutual assent. Consistent with the QC Loan Agreement, the parties entered into the QC Security Agreement, and the $200,000 loan was advanced and repaid. Citing the Restatement (Second) of Contracts, Mr. Bavelis contends that there was no mutual assent, because there is no such assent " '[w]here all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously....'" Bavelis Findings & Conclusions at 103 (quoting Restatement (Second) of Contracts § 18 cmt. c). The example on which Mr. Bavelis relies refers to a "sham" or "jest" and illustrates the point by referencing parties who are joking or simulating a business transaction in a theater production. Restatement (Second) of Contracts § 18 cmt. c. That is not what happened here. Although Mr. Bavelis states in his proposed findings that "Ted Doukas further manifested to Mr. Bavelis that no actual funds were being lent pursuant [to

---

**22.** Both parties introduced parol evidence of the consideration for the QC Loan Documents. That was appropriate because parol evidence is admissible to demonstrate a lack of consideration. *See Ehrlich v. Am. Moning-* *er Greenhouse Mfg. Corp.,* 26 N.Y.2d 255, 309 N.Y.S.2d 341, 257 N.E.2d 890, 891 (1970); *Mangano v. Dawson,* 1995 WL 358685, at *4 (Ohio Ct.App. June 13, 1995).

the QC Loan Documents] and/or obligations incurred thereby," Bavelis Findings & Conclusions at 103, the evidence does not support that finding. Again, there is no evidence of any agreement not to lend or repay $200,000 or not to enter into the QC Security Agreement. In fact, the parties did each of those things.

### 2. Consideration

■ At a minimum, Quick Capital promised to advance $200,000. On Mr. Bavelis's part, there was an implied promise to repay any amount actually advanced, as well as the promise to enter into the QC Security Agreement. These mutual promises constitute consideration supporting the QC Note and the QC Loan Agreement. *See Kowalchuk v. Stroup*, 61 A.D.3d 118, 873 N.Y.S.2d 43, 49 (2009) ("[T]he consideration for a bilateral contract such as this one, in which promises are exchanged, consists of the acts mutually promised....."); *Stewart v. Herron*, 77 Ohio St. 130, 82 N.E. 956, 959 (1907) ("Among the considerations recognized in law as sufficient to support a contract is that of mutual promises, or, as it is sometimes expressed, a promise for a promise.").

In addition, Mr. Doukas advanced funds using a check on which he wrote the words "Consideration on the Note." Mr. Bavelis accepted the check, deposited it into one of his bank accounts and later repaid the loan using checks that stated "Return Loan." Those forms of consideration having been provided, there was no lack of consideration. *See Schron v. Grunstein*, 2012 WL 3887665, at *10 (N.Y.Sup.Ct. Sept. 6, 2012) ("The court has found that the 2004 and 2006 loans were funded. Assuming, as defendants contend, that the loans were not fully funded, the loan agreements and notes would not be voided for lack of consideration. The general rule is that where a party has received some benefit, the

adequacy of consideration is not a proper subject of judicial scrutiny ....") (internal quotation marks omitted); *McCabe*, 2013 WL 173221, at *5 ("The record indicates that the loan was funded, thereby defeating defendant's defense of lack of consideration...."); *Williams v. Ormsby*, 131 Ohio St.3d 427, 966 N.E.2d 255, 259 (2012) ("We also have a long-established precedent that courts may not inquire into the adequacy of consideration, which is left to the parties as the sole judges of the benefits or advantages to be derived from their contracts." (internal quotation marks omitted)).

Mr. Bavelis contends that there was a lack of consideration for the QC Loan Documents because the parties did not bargain for the consideration. Citing the Restatement (Second) of Contracts § 71(2), Mr. Bavelis states that "[a] performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *See* Bavelis Findings & Conclusions at 104. While that statement is true as far as it goes, it does not support a finding of lack of consideration here, because a promise to lend and a promise to repay, as well as a promise to enter into a security agreement to secure the repayment obligation, are sought in exchange for one another. *See European Am. Bank v. Cain*, 79 A.D.2d 158, 436 N.Y.S.2d 318, 321 (1981) ("The promise by the plaintiff to make a loan to Cain would constitute sufficient consideration to support counter promises by Cain that he would repay the loan with interest and by Pepe Motors that it would perform its statutory duty to note the plaintiff's lien on the application for the certificate of title."); *Stonebridge Sec, LLC v. Devine*, 2007 WL 1464431, at *5 (Wash.Ct.App. May 21, 2007) (" 'To constitute consideration, a performance or a return promise must be bargained for' and '[a] perform-

ance or return promise is bargained for if it is sought by the promisor in exchange for that promise.' Restatement (Second) of Contracts, § 71 (1981). Here, the noteholders received consideration for their loans: VIB's promise to repay and, in the alternative, the noteholders' option to convert the notes to stock and the stock purchase warrants.' ").

■■■■■ Mr. Bavelis also argues that Mr. Doukas's promises were gratuitous and that, accordingly, there was no consideration supporting the QC Loan Documents, which Mr. Bavelis contends were executed simply to facilitate what Mr. Bavelis believed to be Mr. Doukas's "promise of ongoing benevolent assistance." Bavelis Findings & Conclusions at 105. It is true that "[g]ratuitous promises are not enforceable as contracts, because there is no consideration." *Carlisle v. T & R Excavating, Inc.,* 123 Ohio App.3d 277, 704 N.E.2d 39, 43 (1997). *See also Loft Rest. Assocs., Ltd. v. McDonagh,* 209 A.D.2d 482, 619 N.Y.S.2d 57, 58 (1994) ("The record before us, including the deposition testimony of the plaintiff's own former counsel, unequivocally demonstrates that the memorandum executed by the defendant McDonagh constituted nothing more than a gratuitous and legally unenforceable promise which was unsupported by valid consideration."). It also is true that "a desire to help cannot be consideration for a contract; rather, it is merely a motive." *Carlisle,* 704 N.E.2d at 43. *See also Pershall v. Elliott,* 249 N.Y. 183, 163 N.E. 554, 556 (1928) ("A motive is not consideration, either legal or equitable.").

Here, Mr. Doukas's motive was not benevolent. Even if it had been, benevolence and consideration may coexist; a promise cannot be discounted as consideration merely because it was made out of a benevolent motive. "For example, if A is induced by friendship to agree to move from one country to another and to build a house upon a site to be conveyed to him by B, although A's motive for entering into the transaction is friendship, if there is an actual bargain to this effect there will be a contract." 3 *Williston on Contracts* § 7:17 (4th ed. 2012). "A's motive or basis for entering into the bargain is of no significance." *Id.* Because Quick Capital's promise to lend and Mr. Bavelis's implied promise to repay, as well as the parties' promise to enter into the QC Security Agreement, were bargained for, the fact that Mr. Bavelis believed Mr. Doukas's motive to be benevolent is beside the point.

True, Quick Capital fulfilled its obligation to lend $200,000 through Nemesis, but that does not demonstrate a lack of consideration. *See Lipkowitz & Plaut v. Affrunti,* 95 Misc.2d 849, 407 N.Y.S.2d 1010, 1015 (N.Y.Sup.Ct.1978) ("It is well established that consideration for a negotiable instrument or a contract may be given or performed by a third party . . . ."); *Sutta v. Lachman,* 13 N.Y.S.2d 779, 780 (N.Y.App. Term 1939) ("The claim that there was no consideration for the check is without merit. The obligations of the vendor under the contract of sale constituted ample consideration. It is not necessary that the consideration should pass from the promisee. Thus the maker's liability to the payee may be supported by a consideration coming from a third person who is not a party to the instrument." (internal quotation marks omitted)); Restatement (Second) of Contracts § 71(4) ("The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.").

## C. Payment

■■■ It is the affirmative defenses of payment, failure of consideration (in contrast to lack of consideration) and fraudu-

lent inducement that carry the day for Mr. Bavelis. The Court will address each in turn. First, Mr. Bavelis relies on the affirmative defense that he repaid any loan made to him. *See* Bavelis Findings & Conclusions at 61–65. As the issuer of the QC Note, Mr. Bavelis bears the burden of proof on the affirmative defense of payment. *See CIT Grp./Factoring Mfrs. Hanover, Inc. v. Supermarkets General Corp.*, 183 A.D.2d 454, 583 N.Y.S.2d 422, 423 (1992) ("[A]lleged payment of an indebtedness must be set forth as an affirmative defense, and the burden is thus on the defendant to plead and prove it . . . ."); *Cadle Co. v. Toler*, 1991 WL 94437, at *1 (Ohio Ct.App. May 28, 1991) ("In an action on the note, the defending party has the burden of proving the affirmative defense of payment."). The burden of proof is by a preponderance of the evidence. *See Machowiak v. Sek*, 13 N.Y.S.2d 910, 911 (N.Y.City Ct.1939); *Blackwell v. Int'l Union, U.A.W.*, 21 Ohio App.3d 110, 487 N.E.2d 334, 337 (1984).

■ Based on the findings of fact regarding payment set forth above, the Court concludes by a preponderance of the evidence that the entire amount lent by Nemesis—whether $200,000 or $250,000—was repaid. Mr. Bavelis repaid the loan through Pella Financial Services, but that was of no more significance than Mr. Doukas using Nemesis to fulfill Quick Capital's obligation to lend the funds to Mr. Bavelis.

## D. Failure of Consideration

■ Of course, Mr. Doukas is seeking much more than two hundred thousand dollars under the QC Loan Agreement. He also seeks $14 million plus interest under the QC Note. Yet the evidence shows that, other than advancing $200,000 or $250,000 of funds in July 2009, Mr. Doukas and his companies completely failed to keep any of the promises that he represents to have been the consideration for the QC Loan Documents. The burden of proof on the issue of failure of consideration is on Mr. Bavelis. *See United Transp. Co. v. Glenn*, 225 A.D. 171, 232 N.Y.S. 373, 377 (1929); *Ohio Loan & Discount Co. v. Tyarks*, 173 Ohio St. 564, 184 N.E.2d 374, 376 (1962). The burden of proof is by a preponderance of the evidence. *See Berggren v. Berggren*, 96 N.Y.S.2d 435, 442 (N.Y.Sup.Ct.1948); *Dumas v. Mustric*, 1993 WL 379125, at *2 (Ohio Ct.App. Sept. 21, 1993).

■ Unlike a lack of consideration, which results in the failure to form a contract, "when there is a failure of consideration, there is originally a contract when the agreement is made, but because of some supervening cause, the promised performance fails." 3 *Williston on Contracts* § 7:11 (4th ed. 2012). That is, "[f]ailure of consideration exists when a promise has been made to support a contract, but that promise has not been performed. Where a failure of consideration exists, the other party is thereby excused from further performance." *Dawson Ins., Inc. v. Freund*, 2011 WL 1167487, at *5 (citations and internal quotation marks omitted). *See also* Ohio Revised Code Ann. § 1303.33(B) (West 2013) ("If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed."). New York law is to the same effect. *See* N.Y. U.C.C. Law § 3–408 (McKinney 2013) ("Want or failure of consideration is a defense as against any person not having the rights of a holder in due course . . . except that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind . . . . Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascer-

tained or liquidated amount."); *Chase Nat'l Bank v. Chem. Corn Exch. Bank (In re Pascal's Estate)*, 146 N.Y.S.2d 364, 368 (N.Y.Sup.Ct.1955) (holding a note unenforceable due to failure of consideration).

 As the evidence shows, Mr. Doukas never purchased shares in Sterling Holding on behalf of Mr. Bavelis, but instead did so on his own behalf. Likewise, Mr. Doukas never purchased the Colonial Bank and First Southern loans or the nonperforming loans of Sterling Bank. The parties' understanding was that Mr. Doukas himself would use his assets to obtain loans in his name in order to purchase the Colonial Bank and First Southern loans, as well as the Sterling Bank nonperforming loans, but he never did so. Even if the deal had been that Mr. Bavelis could somehow pledge assets owned by Mr. Doukas or his companies, there would have been a failure of consideration because the evidence showed that no reasonable lender would have lent money to Mr. Bavelis based on the assets purportedly being made available by Mr. Doukas.

Mr. Doukas never indemnified Mr. Bavelis for his liability on the guarantees of the debt of the Bavelis–Qureshi LLCs or otherwise resolved the disputes with Mr. Qureshi in a manner favorable to Mr. Bavelis, never helped finalize Mr. Bavelis's estate planning and never provided any consulting and management services of value. The parties did not testify that monthly deposits of $80,000 to $120,000 formed part of the consideration for the QC Loan Documents, and even if they had done so, Mr. Doukas never made such deposits. Mr. Bavelis having repaid the funds actually advanced to him, any other obligation he would have had under the QC Loan Documents is unenforceable based on a failure of consideration.

### E. Fraudulent Inducement

 The affirmative defense of fraudulent inducement, which renders a contract "unenforceable by the culpable party," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp.*, 19 A.D.3d 273, 798 N.Y.S.2d 14, 16 (2005),[23] applies here as well. In New York, the elements of fraudulent inducement are "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury[.]" *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1000 (2011).[24]

---

**23.** *See also Plantner v. Hoke*, 122 N.E.2d 298, 299 (Ohio Ct.App.1954).

**24.** Mr. Bavelis and Mr. Doukas both introduced evidence other than the QC Loan Documents to support their view of the obligations thereunder. Thus, the QC Loan Documents clearly do not contain "a complete and unambiguous statement of the parties' contractual intent," *Albrecht v. Marinas Int'l. Consol., L.P.*, 2010 WL 4866289, at *7 (Ohio Ct.App. Nov. 24, 2010) and they do not contain a "final and complete expression of the agreement." *Patrolmen's Benev. Ass'n of City of New York, Inc. v. City of New York*, 27 N.Y.2d 410, 318 N.Y.S.2d 477, 267 N.E.2d 259, 261 (1971) (internal quotation marks omitted). The documents, therefore, are not integrated, and the parol evidence rule does not apply. In fact, both Mr. Bavelis and Mr. Doukas have conceded that the parol evidence rule does not apply. Doukas Findings & Conclusions at 37; Bavelis Findings & Conclusions at 100–01. *See also Galmish v. Cicchini*, 90 Ohio St.3d 22, 734 N.E.2d 782, 789–90 (2000) ("[T]he parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement.... [T]he presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud."); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908–09 (1957) ("[T]he parol evidence rule has no application in a suit brought to rescind a

In Ohio, the elements of the defense of fraudulent inducement are the same:

> (1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance.

*Simon Prop. Grp., L.P. v. Kill,* 2010 WL 1266835, at \*5 (Ohio Ct.App. Apr. 5, 2010). In both states, a burden of proof by clear and convincing evidence rests with the party asserting fraudulent inducement. *See Sung v. Ramirez,* 121 Misc.2d 313, 467 N.Y.S.2d 486, 489 (N.Y.Sup.Ct.1983); *Simon Prop. Grp.,* 2010 WL 1266835, at \*5. Thus, as Mr. Doukas correctly points out, Doukas Findings & Conclusions at 34, Mr. Bavelis has the burden of proving the elements of fraudulent inducement by clear and convincing evidence. For the reasons explained below, the Court concludes that Mr. Bavelis has carried his burden.

## 1. False Representation

■ Fraudulent inducement requires a representation of fact that is not only false, but that the person making the representation knows to be false at the time it is made. The false representation can be made by the party to the contract or, as here, by a person acting on behalf of the party. *See Navigant Consulting, Inc. v. Kostakis,* 2007 WL 2907330, at \*3

(E.D.N.Y. Oct. 4, 2007). Mr. Doukas made several representations to Mr. Bavelis that he knew to be false. First, Mr. Doukas represented to Mr. Bavelis that he had extensive estate-planning experience. Because Mr. Doukas was not an attorney or other estate-planning professional, the clear implication was that Mr. Doukas had at least planned his own estate in the manner he was suggesting for Mr. Bavelis. And yet after Mr. Doukas purchased stock in Sterling Holding in September 2009, he repeatedly requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's. In other words, Mr. Doukas had never performed for himself the estate planning that he promised Mr. Bavelis he would do for him. In fact, there is no evidence that Mr. Doukas ever planned anyone's estate.

In addition, before Mr. Bavelis signed and delivered the QC Loan Documents, Mr. Doukas promised Mr. Bavelis, among other things, that he would work to resolve the issues with Mr. Qureshi in a manner favorable to Mr. Bavelis; that he would deposit $80,000 to $120,000 per month into accounts maintained at Sterling Bank; that he would purchase the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis; that he would help finalize Mr. Bavelis's estate planning; and, while not seeking payment on the QC Note, would return the QC Loan Documents after the estate planning was finalized. As discussed in more detail below, at the time Mr. Doukas made these promises to Mr. Bavelis (either on his own behalf or on behalf of Quick Capital) he had no intention of keeping them.

contract on the ground of fraud. In such a case, it is clear [that] evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement.... [J]ust as [the parol evidence] rule is ineffectual to exclude evidence of fraudulent representations, so [a merger] provision may not

be invoked to keep out such proof. Indeed, if it were otherwise, a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement. Such, of course, is not the law.").

■ Under Ohio law, "a promise made with a present intention not to perform it is a misrepresentation of an existing fact— the speaker's present state of mind[,]" and "[i]f such a false representation induces the other party to enter into a contract, the contract may be voided." *Link v. Leadworks Corp.,* 79 Ohio App.3d 735, 607 N.E.2d 1140, 1145 (1992) (citations omitted). Thus, the promises that Mr. Doukas made with no intention of keeping them count as false representations for purposes of the Court's fraudulent-inducement analysis. Moreover, Mr. Doukas represented to Mr. Bavelis that he would not be required to make payments under the QC Note. Because Mr. Doukas intended to seek payment under the QC Note, the representation that no payments would be required provides an additional basis for a finding of fraudulent inducement under Ohio law. *See Rieck Mech. Elec. Servs., Inc. v. Warner,* 2002 WL 1252521, at *2 (Ohio Ct.App. June 7, 2002) ("Warner has alleged that Rieck told him that the cognovit note 'was merely paperwork and of no consequence and would be forgiven when the purchase of L.O. Warner, Inc. was completed.' This, if true, may be sufficient to establish a meritorious defense of fraudulent inducement...."); *Star Bank, N.A. v. Jackson,* 2000 WL 1760513, at *5 (Ohio Ct.App. Dec. 1, 2000) ("[I]f Jackson had alleged that the bank itself had told him that his signature on the note was merely perfunctory and that the bank had no intention of seeking payment from him, he might have alleged enough operative facts to support a defense of fraudulent inducement.").

■ Although the result is the same under New York law, the law of that state is a bit more complex. As in Ohio, "[u]nder New York law, fraudulent inducement is a valid defense to an action by the holder of a negotiable instrument to en-

force the instrument." *Thornock v. Kinderhill Corp.,* 749 F.Supp. 513, 518 (S.D.N.Y.1990). And a "person's intent, his state of mind, it has long been recognized, is capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action." *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958). But courts applying New York law have held that, in order to support a claim of fraudulent inducement, the inducement must be effectuated by a false promise other than the promise to perform the terms of the contract:

> It is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.
>
> It is equally well settled under state law that if a promise was made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact. And it is precisely such a misrepresentation which can serve as the basis for a claim of fraud.
>
> Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was "collateral or extraneous" to the terms of an enforceable agreement in place between the parties.

*See Int'l CableTel Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486–87 (S.D.N.Y.1997) (citations and quotation marks omitted) (Sotomayor, J). In other words, the rule in New York is that a false promise can support a claim of fraud only

where that promise was collateral or extraneous to the terms of the parties' agreement—that is, where the promise "involve[s] a duty separate from or in addition to that imposed by the contract." *Hawthorne Grp., LLC v. RRE Ventures,* 7 A.D.3d 320, 776 N.Y.S.2d 273, 276 (2004). It is unclear whether this rule applies only when a plaintiff is seeking affirmative relief by means of a tort claim for fraudulent inducement or whether it also applies when a defendant on a contract or note claim is asserting fraudulent inducement as an affirmative defense. At least one decision by a New York court suggests that the rule would apply to the affirmative defense. *See Hotel 71 Mezz Lender LLC v. Mitchell,* 63 A.D.3d 447, 880 N.Y.S.2d 67, 69 (2009) ("Mitchell's allegations supporting his defense of fraudulent inducement sound in failure to perform promises of future acts, which amounts simply to breach of contract. Mitchell does not allege that plaintiff breached any duty owed him separate and apart from the contractual duty....").

The Court need not decide the issue here, because Mr. Doukas made promises separate from and in addition to those imposed by the QC Loan Documents. The only obligations expressly mentioned in the QC Loan Agreement are that *Quick Capital* will (a) provide "consulting and management services" (which is referenced only in a recital) (b) make certain assets available and (c) lend $200,000. There is nothing in the QC Loan Agreement about Mr. Doukas negotiating with Mr. Qureshi on behalf of Mr. Bavelis, or causing his companies to make monthly deposits of at least $80,000 in accounts maintained at Sterling Bank, or purchasing the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis, or helping Mr. Bavelis finalize his estate planning. That is, Mr. Doukas made several promises that were separate from and in addition to those imposed by the QC Loan Documents and that therefore are "collateral or extraneous" to the terms of the QC Loan Documents.

In addition, Mr. Doukas's representation that no payments would be required under the QC Note was not a promise that Quick Capital would perform the terms of the QC Loan Agreement; instead, it was a promise that Mr. Bavelis would not be required to perform. As have Ohio courts, at least one New York court has held that a representation that no payments would be required under a promissory note could support a finding of fraudulent inducement if the payee in fact intended to seek payment. *See McCabe,* 2013 WL 173221, at *4 (N.Y.Sup.Ct. Jan. 16, 2013) ("[D]efendant herein may pursue his fraudulent inducement claim premised on an oral misrepresentation to forego demanding repayment of the notes."). In sum, under both New York and Ohio law, Mr. Doukas made promises that, if he did not intend to keep them or cause one of his companies to keep them, constituted false representations of fact.

The question then becomes whether, at the time he made the promises, Mr. Doukas intended to keep them. The Court concludes that, at the time he made these promises to Mr. Bavelis, Mr. Doukas had no intention of fulfilling them, but instead intended to seek collection on the QC Note and to obtain control over Mr. Bavelis's assets. The record evidence of Mr. Doukas's intent is abundant. First, as already discussed, Mr. Doukas never kept the promises. True, "an inference that the promisor never intended to fulfill his promise should not be based solely upon the assertion that the promise was not, in fact, fulfilled," *Braddock v. Braddock,* 60 A.D.3d 84, 871 N.Y.S.2d 68, 72 (2009), but it is a factor to be considered.

*See Adams v. Clark,* 239 N.Y. 403, 146 N.E. 642, 644 (1925) ("Proof of failure to keep a promise may tend to establish the intent not to keep it, but common experience teaches us that such proof is not conclusive; that the making of an unkept promise does not imply of necessity in all cases a present intention not to keep the promise.").

■■■■ Moreover, "a present intention not to fulfill a promise is generally inferred from surrounding circumstances, since people do not ordinarily acknowledge that they are lying." *Braddock,* 871 N.Y.S.2d at 72. *See also Gelzer Sys. Co., Inc. v. Indus. Mach. & Supply Co.,* 1986 WL 2488, at *5 (Ohio Ct.App. Feb. 20, 1986) ("[A] fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance, although that fact may, when coupled with evidence of other pertinent circumstances, support an inference of lack of intent to perform at the time the promise was made." (internal quotation marks omitted)).

Taking Mr. Doukas's promises one at a time, the Court concludes that, in addition to the fact that he did not keep them, there is other evidence that at the time they were made Mr. Doukas did not intend to fulfill them and that he intended that his false representations would induce Mr. Bavelis to sign the QC Loan Documents. Before the QC Loan Documents were executed, Mr. Doukas promised that he would work to resolve the issues with respect to the Bavelis–Qureshi LLCs in a manner beneficial to Mr. Bavelis. Not only did Mr. Doukas not do so, one of his companies, Nemesis, received an assignment of the 50% interest in the Bavelis–Qureshi LLCs owned by Mr. Bavelis, Bavelis Family and FLOHIO without any indemnification being provided to Mr. Bavelis on his guarantees of the bank debt.[25] When Mr. Bavelis signed the QC Loan Agreements, he not only put himself in the position of being an obligor on a $14 million promissory note, he also, by signing the QC Security Agreement, gave what was essentially a second lien on certain of his shares in Sterling Holding and the securities previously pledged to Fifth Third. Mr. Bavelis would eventually transfer all of his interests and purport to transfer the interests owned by other entities in the Bavelis–Qureshi LLCs to Nemesis. In addition, if Mr. Bavelis had signed the TNS Agreement, he would have transferred his interests in most of the Ohio Partnerships to an entity with directors whom he did not know. "[T]he full range of the troubling series of events visited on" Mr. Bavelis, *Braddock,* 871 N.Y.S.2d at 73, leads the Court to conclude that Mr. Doukas never intended to fulfill his promise to Mr. Bavelis of working to resolve matters with Mr. Qureshi in a manner favorable to Mr. Bavelis, nor for that matter, did he intend to keep any of the promises he made to Mr. Bavelis, but instead intended to take advantage of Mr. Bavelis and deprive him of his assets. *See Braddock,* 871 N.Y.S.2d at 73 ("[T]he inference that David knew all along that he would not fulfill his promises to John may be drawn from the full range of the troubling series of events visited on John. Those events, viewed together, permit the conclusion that David conducted himself in bad faith, planning all along to take advantage of his cousin's trust in order to obtain from him, at a fraction of the usual cost, the crucial service of finding the necessary investor to provide the start-up capital, and that he planned that once the necessary investor was on board, he would remove John by degrees until he

---

**25.** This assumes without deciding that Mr. Bavelis had the authority to make the assignments on behalf of FLOHIO and Bavelis Family.

was excised from the company completely.").

In addition to Mr. Doukas's efforts to take advantage of Mr. Bavelis and the unfortunate events that befell Mr. Bavelis as a result, there is other evidence that Mr. Doukas did not intend to fulfill the promises that induced Mr. Bavelis to sign the QC Loan Documents. Prior to the execution of those documents, Mr. Doukas promised that he would cause monthly deposits of at least $80,000 to be made into accounts maintained at Sterling Bank and would purchase nonperforming loans of Sterling Bank. The evidence, however, demonstrates that neither Mr. Doukas nor his companies had the ability to make deposits at the promised level and that the values of his assets would not support the purchase of Sterling Bank's nonperforming loans. Accordingly, at the time Mr. Doukas made those promises, he knew that he had no ability to fulfill them. "[I]f a promisor had no reasonable ground to anticipate that his undertaking might be carried out, it seems that this fact may establish a prima facie case that the promise was not made in good faith." *Gelzer Sys. Co.*, 1986 WL 2488, at *5 (Ohio Ct.App. Feb. 20, 1986). *See also Bell v. Smith (In re Smith)*, 232 B.R. 461, 466 (Bankr.D.Idaho 1998) ("A promise made with a positive intent not to perform or without a present intent to perform satisfies [Section] 523(a)(2)(A) ... as does a representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform." (internal quotation marks omitted)).

Furthermore, Mr. Doukas promised that he would purchase the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis. As Mr. Bavelis testified, not only did the purchase of the Colonial Bank and First Southern loans never occur, Mr. Doukas's failure to do what was re-

quired—provide documents requested by the banks to allow them to properly analyze Mr. Doukas's proposal—was the reason the purchase did not happen. That is, not only did Mr. Doukas not keep his promise, he failed to take the most basic steps that would have been necessary to be in a position to fulfill the promise. Accordingly, the Court concludes that Mr. Doukas never had any intention of fulfilling his promise of purchasing the Colonial Bank and First Southern loans in order to assist Mr. Bavelis. *See Gelzer Sys. Co.*, 1986 WL 2488, at *5 ("An intention not to perform may be inferred from the fact that, after performance by the promisee, the promisor does not even make a pretense of carrying out his promise, or evades and refuses to perform it.").

Then there was the estate planning. When Mr. Doukas's attorney asked him during the trial whether he had "ever had any discussions with Mr. Bavelis about planning his estate, and I'm talking about not matters of creditors but planning his estate for estate purposes, death," Tr. at 895:2–5, Mr. Doukas responded "No." Tr. at 895:6. To the contrary, as already discussed, there is considerable evidence that, before the QC Loan Documents were executed, Mr. Doukas promised that he would help finalize Mr. Bavelis's estate planning. The Bavelises both testified that Mr. Doukas had promised to assist Mr. Bavelis with estate planning, and they were much more credible witnesses than was Mr. Doukas, who denied that he offered to help Mr. Bavelis plan his estate. In addition to discussing estate planning generally, Mr. Doukas was specific, advising Mr. Bavelis that, in Mr. Bavelis's words, "it was going to be for the future, for my grandkids and my great-grandkids, I would form this perpetuity, perpetual something...." Tr. at 785. That is, the estate planning services promised by Mr. Doukas related to plan-

ning Mr. Bavelis's estate for his eventual death.

Other than the fact that he never did so, what is the evidence that Mr. Doukas did not intend to perform estate planning services for Mr. Bavelis? Mr. Doukas represented that, in Mr. Bavelis's words, "George, I have done this before and I can help you with this thing" and "I can help you with this, I have done it." Tr. at 582–83. Yet Mr. Doukas had never even done for himself the estate planning that he had promised in June 2009 he would do for Mr. Bavelis, and there is no evidence that he ever helped plan anyone's estate. At the time he promised Mr. Bavelis that he would help finalize his estate planning, Mr. Doukas knew that he did not have the ability to do so, thus making his promise a false representation. *See Gelzer Sys. Co.*, 1986 WL 2488, at *5; *Smith*, 232 B.R. at 466.

Mr. Doukas promised that he would return the QC Loan Documents after the estate planning was finalized and that no payments would be required under the QC Note. But Mr. Doukas never intended to finalize Mr. Bavelis's estate planning, and it follows that he likewise never intended to return the QC Loan Documents. In fact, on at least two occasions—in October 2009 and January 2010, Mr. Bavelis requested that the QC Loan Documents be returned, but Mr. Doukas, while saying he would do so, put Mr. Bavelis off. Again, "[a]n intention not to perform may be inferred from the fact that, after performance by the promisee, the promisor does not even make a pretense of carrying out his promise, or evades and refuses to perform it." *Gelzer Sys. Co.*, 1986 WL 2488, at *5. In addition to all of the foregoing, the evidence that Mr. Doukas intended to seek payment under the QC Note despite representing to Mr. Bavelis that he would not do so includes the fact that, within a

couple of months after the execution of the QC Note, Mr. Doukas requested that Mr. Bavelis issue Quick Capital two checks in the amount of $58,300, even though there was no change in circumstances since the time that Mr. Doukas had promised that no payments would be required. *Cf. United States v. Shah*, 44 F.3d 285, 293 n. 14 (5th Cir.1995) ("[W]here only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances, an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred.") (internal quotation marks omitted).

### 2. Materiality

 In order to support a finding of fraudulent inducement, a representation of fact must not only be false, it must be material. There is both an objective and a subjective component of the materiality analysis. *See Geer v. Union Mut. Life Ins. Co.*, 273 N.Y. 261, 7 N.E.2d 125, 127 (1937) ("The materiality of a representation may then depend upon the idiosyncrasies or the individuality of the person who acts upon the representation, and often must be determined as a question of fact by the trier of the facts. Nevertheless at times, departure in a representation from an accurate statement of the truth may be so slight that we may confidently say that the difference could not affect [the] decision of any reasonable person. Then as a matter of law the misrepresentation is not material."). "A fact is material if it is likely, under the circumstances, to affect the conduct of a reasonable person with reference to the transaction." *Leal v. Holtvogt*, 123 Ohio App.3d 51, 702 N.E.2d 1246, 1262 (Ohio Ct.App.1998) (internal quotation marks omitted). "Although this standard is generally objective, an exception arises when the individual responsible for the misrepresentation is aware that the

recipient is peculiarly disposed to attach importance to a particular subject; in such an instance the misrepresentation should be deemed material, regardless of its significance to a reasonable person under similar circumstances." *Market St. Grp. v. McComb*, 1998 WL 404478, at *3 (Ohio Ct.App. Mar. 27, 1998) (internal quotation marks omitted).

■ In light of the financial condition of Sterling Bank in June 2009, the false representations that Mr. Doukas made to Mr. Bavelis regarding his intent to make monthly deposits of at least $80,000 into accounts maintained at Sterling Bank and to purchase nonperforming Sterling Bank loans were objectively material from the standpoint of a reasonable person. Moreover, based on his conversations and other communications with Mr. Bavelis, Mr. Doukas knew that Mr. Bavelis was disposed to attach importance to those promises. In fact, Mr. Doukas conceded that he knew Sterling Bank was important to Mr. Bavelis, Tr. at 329:12, and testified specifically that his obtaining the nonperforming loans of Sterling Bank was "even more important" than raising capital for the bank. Tr. at 891:24. Given Mr. Bavelis's financial situation and other circumstances in June 2009—including the recent death of his brother, the disputes with Mr. Qureshi and his multimillion dollar liability on bank debt—Mr. Doukas knew that his promises to resolve the issues with Mr. Qureshi, to purchase the Colonial Bank and First Southern loans, to help finalize Mr. Bavelis's estate planning and to return the QC Loan Documents after the estate planning was finalized were important to Mr. Bavelis. As Mr. Doukas testified, "[e]verything was important to him." Tr. at 329:9. Mr. Bavelis would not have signed the QC Loan Documents without these promises. Accordingly, the Court concludes that Mr. Doukas's false representations were material.

### 3. Justifiable Reliance

■ In agreeing to sign the QC Loan Documents, Mr. Bavelis actually relied on Mr. Doukas's false representations. A successful fraudulent-inducement defense, however, requires that the reliance be justifiable. Under New York and Ohio law, answering the question of whether reliance was justifiable requires a review of all the facts and circumstances. *See JP Morgan Chase Bank v. Winnick*, 350 F.Supp.2d 393, 406 (S.D.N.Y.2004) ("In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view. . . ."); *Braddock*, 871 N.Y.S.2d at 72 ("[T]he element of justifiable reliance . . . is generally one of fact. . . ."); *Lepera v. Fuson*, 83 Ohio App.3d 17, 613 N.E.2d 1060, 1065 (1992) ("The question of justifiable reliance is one of fact. . . .").

■ Factors considered by New York courts when conducting the justifiable-reliance analysis include "the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *Winnick*, 350 F.Supp.2d at 406. Likewise, Ohio courts also "consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Feliciano v. Moore*, 64 Ohio App.2d 236, 412 N.E.2d 427, 430 (1979) (internal quotation marks omitted). Here, the most salient facts are the apparent close friendship between Mr. Bavelis and Mr. Doukas, the trust and confidence that Mr. Bavelis placed in Mr. Doukas, the

promissory nature of certain of Mr. Doukas's misrepresentations and the inability of Mr. Bavelis to know Mr. Doukas's state of mind at the time he made his various promises prior to the execution of the QC Loan Documents.

As developed above in the Court's findings of fact, Mr. Doukas worked assiduously to foster a friendship and fraternity with Mr. Bavelis that appeared to be based on mutual trust and confidence. "[T]here are numerous cases finding that evidence of friendship or a close personal relationship weighs heavily in favor of finding at least justifiable reliance if not the higher level of reasonable reliance." *Lance v. Tillman (In re Tillman)*, 197 B.R. 165, 171 (Bankr. D.C.1996) (decided in the § 523(a)(2)(A) context). "The courts reason that [people] are not to be faulted for relying on the honesty of close friends who take advantage of them." *Id.See also Montalto v. Sobel (In re Sobel)*, 37 B.R. 780, 785 (Bankr.E.D.N.Y.1984) ("Because of the relationship of trust and confidence which had been built up between the younger people and the Sobels, it was easy for the former to credit Sobel's explanation.... They are not to be faulted if they believed that their close friends and the godparents of one of their children would deal honestly with them."); *Dlouhy v. Frymier*, 92 Ohio App.3d 156, 634 N.E.2d 649, 652 (1993) (concluding that there was justifiable reliance on misrepresentations made to induce the entry into contracts where, among other things, the person who made the misrepresentations had "fostered a relationship of trust and friendship prior to presenting the contracts"). Based in part on the friendship and fraternity that Mr. Bavelis believed he had with Mr. Doukas and the trust and confidence that Mr. Bavelis placed in Mr. Doukas as a business advisor, the Court concludes that Mr. Bavelis's reliance on each of Mr. Doukas's false representations was justifiable.

This includes Mr. Bavelis's reliance on Mr. Doukas's representation that he had estate-planning experience. Mr. Doukas contends that Mr. Bavelis's reliance on any such representation was not justifiable, pointing out that the biography he presented to Mr. Bavelis "did not contain any representation that Mr. Doukas had ever planned an Estate." Doukas Findings & Conclusions ¶ 25. According to Mr. Doukas, Mr. Bavelis could not have "reasonably relied" on the representation that Mr. Doukas would help plan Mr. Bavelis's estate. Doukas Findings & Conclusions ¶ 34. The Court need not decide whether Mr. Bavelis's reliance was reasonable; the standard under New York and Ohio law is the lower standard of justifiable reliance. And Mr. Doukas's statement that "[a]ll of the evidence supports the factual conclusion" that, prior to signing the QC Loan Documents Mr. Bavelis "had actual knowledge ... that Doukas had never been engaged in any activity as an estate planner," Doukas Findings & Conclusions ¶ 34, is simply not true. All of the evidence supports the finding that Mr. Doukas falsely represented to the Bavelises that he had planned estates. The fact that he did not make that representation in his biography is beside the point.

Other than attacking Mr. Bavelis's reliance on the estate-planning representation, Mr. Doukas does not state in his proposed conclusions of law why he believes Mr. Bavelis's reliance was not justifiable, but he does argue that Mr. Bavelis has failed to carry his burden with respect to any of the elements of fraudulent inducement. Doukas Findings & Conclusions at 34. Hints of what Mr. Doukas may be thinking in this regard came out during the hearing. Counsel to Mr. Doukas asked questions of Mr. Bavelis that seemed to suggest that Mr. Bavelis's reliance on Mr. Doukas's various promises

was not justifiable because he failed to conduct an investigation regarding Mr. Doukas's representations. Tr. at 665–93. If this is Mr. Doukas's position, as explained below, it is not well taken in light of the relationship between Mr. Bavelis and Mr. Doukas.

■ Generally speaking, under New York law, in order for reliance to be considered justifiable, there is a duty to review documents or other information to which a party has access. *See Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 633 (S.D.N.Y.1999) ("The broad rule is that where parties have access to information that could expose a misrepresentation, courts will not find their reliance sufficiently justifiable to merit legal protection."). But a failure to investigate does not render reliance unjustifiable, or even unreasonable, if there is a fiduciary relationship between the parties. *See Frame v. Maynard*, 83 A.D.3d 599, 922 N.Y.S.2d 48, 51 (2011) ("The trial court correctly found that Paulson and Guthrie, as beneficiaries of this fiduciary relationship, were entitled to rely on Maynard's representations and his complete, undivided loyalty and were not required to perform independent inquiries in order to reasonably rely on their fiduciary's representations...." (citations and internal quotation marks omitted)); *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *14 (S.D.N.Y. Feb. 15, 2013) ("As was made clear by *Frame*, even a sophisticated party may justifiably rely upon a fiduciary to represent the truth and disclose all material facts.").

In Ohio, the law is not entirely clear regarding whether in general a party as-serting fraud has a duty to investigate information to which he or she has access. On the one hand, at least where the representation is one regarding the income stream or other financial condition of a business, some Ohio courts have held that "[t]he recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Steiner v. Roberts*, 131 N.E.2d 238, 242 (Ohio Ct.App.1955) (internal quotation marks omitted).[26]

■ Other courts applying Ohio law, however, have held that "[a] person has no right to rely on misrepresentations when the true facts are equally open to both parties." *Columbia Gas Transmission Corp. v. Ogle*, 51 F.Supp.2d 866, 875–76 (S.D.Ohio 1997), *aff'd*, 1998 WL 879583 (6th Cir. Nov. 25, 1998). Nonetheless, as in New York, there is no duty to investigate if there is a fiduciary relationship between the parties. *See Aetna Ins. Co. v. Reed*, 33 Ohio St. 283, 292 (Ohio 1877); *Finomore v. Epstein*, 18 Ohio App.3d 88, 481 N.E.2d 1193, 1196 (1984).

■ "[A] fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (1976). "It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Id.* "The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another...." *Id.* at 904–05. Like-

---

**26.** Investigation may be required under Ohio law if the false representation relates to the physical condition of property. *See, e.g., Findlay Ford Lincoln–Mercury v. Huffman*, 2004 WL 231511, at *4 (Ohio Ct.App. Feb. 9, 2004); *Van Horn v. Peoples Banking Co.*, 64 Ohio App.3d 745, 582 N.E.2d 1099, 1101 (1990). Such a representation is not at issue here.

wise, under Ohio law, "[a] fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis,* 66 Ohio St.2d 74, 419 N.E.2d 1094, 1097–98 (1981) (internal quotation marks omitted). "A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed." *Stone,* 419 N.E.2d at 1098 (Ohio 1981) (citation and internal quotation marks omitted).[27]

 Under both New York and Ohio law, therefore, the defining qualities of a fiduciary relationship are the trust and confidence that one party places in another and the resulting influence exercised by the person in whom the trust and confidence is placed. The question of whether a fiduciary relationship exists between two parties is an issue of fact. *See EBC I, Inc. v. Goldman, Sachs & Co.,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (2005); *Sacksteder v. Senney,* 2012 WL 4480695, at *18 (Ohio Ct.App. Sept. 28, 2012).

 Based on its findings of fact, the Court concludes that, as of the date the QC Loan Documents were executed, Mr. Bavelis placed special confidence and trust in Mr. Doukas and that, as a result, Mr. Doukas exercised considerable influence over Mr. Bavelis. By the time Mr. Bavelis signed the QC Loan Documents,

Mr. Doukas had made numerous representations that led Mr. Bavelis to believe that he and Mr. Doukas were close friends and "brothers" based in part on their shared values and common heritage. Although "personal connections of that sort alone" are insufficient to establish a fiduciary relationship between two parties, *Roni LLC v. Arfa,* 74 A.D.3d 442, 903 N.Y.S.2d 352, 355 (2010), *aff'd, Roni LLC v. Arfa,* 18 N.Y.3d 846, 939 N.Y.S.2d 746, 963 N.E.2d 123 (2011), such a close connection is a factor to be considered in determining whether a fiduciary relationship exists. *See Amusement Indus.,* 2013 WL 628533, at *10 ("In *Roni LLC,* the Court of Appeals considered the defendants playing upon the cultural identities and friendship of the plaintiffs—a circumstance present here as well—as one factor in favor of finding a fiduciary relationship." (internal quotation marks omitted)); *Roni,* 963 N.E.2d at 125 ("Moreover, plaintiffs contend that the promoter defendants assumed a position of trust and confidence, in part, by 'playing upon the cultural identities and friendship' of plaintiffs. Accepting the totality of these allegations to be true, as we must at this early stage of the litigation, the complaint adequately pleads a fiduciary relationship."). Mr. Bavelis provided clear and convincing evidence that, from the very beginning, Mr. Doukas used their shared cultural identity in order to create a close friendship between them.

Mr. Doukas also made statements to Mr. Bavelis regarding his expertise and extensive experiencing in restructuring

---

**27.** "[T]he term 'fiduciary relationship,' for purposes of § 523(a)(4), is determined by federal, not state, law[,]" and the Sixth Circuit "construes the term 'fiduciary capacity' found in the defalcation provision of § 523(a)(4) more narrowly than the term is used in other circumstances." *Commonwealth Land Title Co. v. Blaszak (In re Blaszak),* 397 F.3d 386, 390–91 (6th Cir.2005). Section 523(a)(4) is not at issue here, and it is applicable state law, not federal law, that determines whether a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas at the time the Quick Capital Loan Documents were executed—and thus whether Mr. Bavelis had a duty to investigate Mr. Doukas's representations—for purposes of the fraudulent—inducement analysis.

debts, and those statements led Mr. Bavelis to believe that he could place trust and confidence in Mr. Doukas as a business advisor. As a result, Mr. Bavelis viewed Mr. Doukas as a trusted source of business and restructuring advice, referring to him to others as his "advisor," Debtor's Ex. 58 and "special friend and partner." Debtor's Ex. 51. Mr. Bavelis instructed others, including Mr. Albright and one of Sterling Bank's litigation attorneys, to rely on and consult with Mr. Doukas. In fact, based on Mr. Doukas's advice, Mr. Bavelis even declined at times to consult his own long-time counsel, relying instead on Mr. Doukas. The extent of Mr. Bavelis's reliance on Mr. Doukas supports the conclusion that a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas. *See Manela v. Garantia Banking Ltd.*, 5 F.Supp.2d 165, 179 (S.D.N.Y.1998) ("Plaintiffs point to numerous facts capable of supporting the conclusion that the necessary relationship of trust and confidence existed between Manela and defendants. For example, plaintiffs point out that Manela spoke to Stallone on a near-daily basis and often acted in reliance on Stallone's advice, such as when he invested in the GDF.") (footnote omitted).

Furthermore, as of June 2009, Mr. Bavelis and Mr. Doukas had prior financial dealings that led Mr. Bavelis to trust Mr. Doukas and rely on him. After Mr. Bavelis became involved with the Glenn Wright matter, Mr. Doukas relented on his demands with respect to the lots he had received by quitclaim deed. By June 2009 Mr. Doukas had purchased approximately $200,000 of stock in Sterling Holding and had deposited $2 million from his divorce into accounts maintained at Sterling Bank. "Although it is true that friendship alone does not establish a confidential relationship ... fiduciary relationships have been found between close friends with prior business or financial dealings...." *Amuse-*

*ment Indus.*, 2013 WL 628533, at \*10 (citation and internal quotation marks omitted). *See also Schwartz v. Houss,* 2005 WL 579152, at \*4 (N.Y.Sup.Ct. Jan. 3, 2005) (holding that fiduciary relationship may exist between close friends with prior financial dealings such that they are not "merely social friends").

This relationship of trust and confidence did not merely exist in Mr. Bavelis's mind. Mr. Doukas himself testified that Mr. Bavelis was entitled to trust him from March through December 2009. Tr. at 939:10–14. Based on all the evidence, the Court concludes that, as of the date the QC Loan Documents were executed, a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas, and Mr. Bavelis therefore had no duty to investigate Mr. Doukas's various representations.

As already discussed, Mr. Doukas promised Mr. Bavelis that he would make significant monthly deposits into accounts maintained at Sterling Bank and that he would purchase the nonperforming loans of Sterling Bank, as well as the loans guaranteed by Mr. Bavelis. Although the Court would not include these promises as a basis for fraudulent inducement in the absence of a fiduciary relationship between Mr. Bavelis and Mr. Doukas (because an investigation of Mr. Doukas's tax returns would have revealed the inability of Mr. Doukas or his companies to fulfill the promises), the existence of a fiduciary relationship between Mr. Bavelis and Mr. Doukas renders Mr. Bavelis's reliance on Mr. Doukas's promises justifiable.

Moreover, even if a fiduciary relationship had not existed between Mr. Bavelis and Mr. Doukas and, accordingly, Mr. Bavelis was required to review the documents to which he had access (such as the tax returns for Mr. Doukas and his companies), Mr. Bavelis's reliance on certain of Mr. Doukas's promises still would

have been justifiable. "[A] plaintiff's failure to investigate will not preclude a finding of reasonable reliance where the facts allegedly misrepresented are peculiarly within the defendant's knowledge [and plaintiff] has no independent means of ascertaining the truth." *Doehla v. Wathne Ltd., Inc.,* 1999 WL 566311, at *13 (S.D.N.Y. Aug. 3, 1999).[28] "In such a case, reasonable reliance may be found even where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *Id.* There is nothing more peculiarly within a person's knowledge than the state of his or her mind—until, as here, the person's subsequent actions reveal it. No documents or other information available to Mr. Bavelis would have revealed that Mr. Doukas did not intend to keep certain of his promises. In particular, absent an ability to read Mr. Doukas's mind, Mr. Bavelis would have had no way of knowing at the time he signed the QC Loan Documents that Mr. Doukas did not intend to resolve the issues related to the Bavelis–Qureshi LLCs in a manner beneficial to Mr. Bavelis or that Mr. Doukas did not intend to help him finalize his estate planning. Thus, the promissory nature of Mr. Doukas's false representations also leads the Court to conclude that Mr. Bavelis's reliance was justifiable.

Aware of the conflict between Mr. Albright and Mr. Doukas, Mr. Bavelis knew that others viewed Mr. Doukas as a difficult person with whom to transact business. Mr. Bavelis would later say that he was "very embarrassed . . . that I didn't recognize what kind of a person I was dealing with . . . for so long." Tr. at 762. "I've been in business for 40 years and I think I had a pretty good sense of getting a message of whom I'm dealing with but I didn't, this guy [misled] me." Tr. at 762. After the execution of the QC Loan Documents, Mr. Bavelis had his doubts about Mr. Doukas from time to time. For example, Mr. Bavelis became uncomfortable with Mr. Doukas as a result of receiving the TNS Agreement in July 2009; as a result of Mr. Doukas's delay after September 2009 in identifying the entity that would be named on the stock certificate for the shares Mr. Doukas purchased in Sterling Holding, ostensibly because he was forming a trust like Mr. Bavelis's; as a result of Mr. Doukas's failure to return the QC Loan Documents notwithstanding Mr. Bavelis's request for their return in October 2009; and as a result of his lack of success in negotiating a deal with Mr. Qureshi up until the alleged breakthrough Mr. Doukas announced at the coffee shop in Boca Raton in December 2009. On the date he signed the QC Loan Documents, however, Mr. Doukas had not yet done anything to cause Mr. Bavelis's trust in him to wane.

The Court concludes that, in agreeing to sign the QC Loan Documents, Mr. Bavelis justifiably relied on Mr. Doukas's promises to make minimum monthly deposits of $80,000 into accounts maintained at Sterling Bank, to resolve the issues with Mr. Qureshi in a manner that would benefit Mr. Bavelis, to purchase the Colonial Bank and First Southern loans as well as the nonperforming Sterling Bank loans, to help finalize Mr. Bavelis's estate planning, to not seek payments under the QC Note and to return the QC Loan Documents after the estate planning was finalized.

**4. Injury**

 Mr. Bavelis's justifiable reliance proximately caused him injury. As a result of Mr. Doukas's fraud, Mr. Bavelis

---

**28.** Although this case refers to "reasonable" reliance, it remains relevant given that justifiable reliance is a lower standard.

became the ostensible obligor on a $14 million promissory note. Even though Mr. Doukas had represented to Mr. Bavelis that no payments would be due and that the QC Loan Documents would be returned, Mr. Bavelis (at Mr. Doukas's request approximately a month after the documents were signed), issued Quick Capital two checks, each in the amount of $58,300, which Mr. Bavelis believed related to his estate planning. Mr. Doukas advised Mr. Bavelis that he would return the checks, but he never did. Instead, Quick Capital filed a lawsuit against Mr. Bavelis in New York state court. In addition, the pursuit of the claim on the QC Note has caused Mr. Bavelis considerable time and expense litigating the matter in this Court. The Court, therefore, concludes that Mr. Bavelis has established each of the elements of fraudulent inducement with respect to the QC Loan Documents by the required standard of clear and convincing evidence.

### F. Mr. Doukas Has No Claim Against Mr. Bavelis Under Florida Law

█ Quick Capital has argued that, if Mr. Doukas in fact purchased the shares of stock in Sterling Holding on his own behalf, Mr. Doukas personally has a claim against Mr. Bavelis under Florida law. That argument has no legal basis. Quick Capital relies on two Florida statutes. First, Quick Capital relies on Fla. Stat. Ann. § 517.061(11). According to Quick Capital, this section "provided Doukas with a three-day right of recession [sic][,]" and Mr. Doukas "made a timely recession [sic] demand. . . ." Doukas Findings & Conclusions ¶¶ 121, 123.

Any demand made by Mr. Doukas was untimely. If an issuer is offering securities exempt from registration under Fla. Stat. Ann. § 517.061(11) and the sale is to five or more persons in Florida (both of which was the case with Sterling Holding), then "any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later." Fla. Stat. Ann. § 517.061(11)(a)(5). As the Court found above, Mr. Doukas received the private placement memorandum, which notified him of the right of rescission. Thereafter, on September 23, 2009, Mr. Doukas tendered the consideration to Sterling Holding. Mr. Doukas sent his letter that he now claims was a timely rescission demand nearly five months—not three days—after he tendered the consideration. The date he received the stock certificate is not relevant but, even if it were, he sent the letter seven days, not three days, after receiving the stock certificate.

Quick Capital also relies on Fla. Stat. Ann. § 517.211, regarding the remedies available in cases of sales of securities that are unlawful because, for example, they are not either exempt or registered. As already noted, Sterling Holding made an exempt securities offering. There is no evidence that the sale of securities was otherwise unlawful. Mr. Doukas, therefore, has no claim against Mr. Bavelis based on his purported right of rescission.

### V. Conclusion

For the reasons set forth above, the Court concludes that any claim asserted by Quick Capital claim should be disallowed and that neither Mr. Doukas nor any of his companies has any claim against Mr. Bavelis or his bankruptcy estate. Accordingly, the Proofs of Claim are disallowed in their entirety.

**IT IS SO ORDERED.**